## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HELIO LOGISTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | |
| -against- | ) | |
| | ) | JURY TRIAL DEMANDED |
| APOORVA MEHTA, CLOUD HEALTH SYSTEMS, | ) | |
| LLC d/b/a SUNRISE HEALTH, TEJASVI SINGH | ) | |
| and RIDDHI SINGH, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Helio Logistics, Inc. ("Helio" or "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants Apoorva Mehta ("Mehta"), Cloud Health Systems, LLC d/b/a Sunrise Health ("Sunrise Health"), Tejasvi Singh ("Tejasvi") and Riddhi Singh ("Riddhi" and, collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.          This is an action for acts of trade secret misappropriation in violation of the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1832, breach of contract, fraudulent inducement, fraudulent misrepresentation, unfair competition, and related claims under the laws of the State of New York. Plaintiff brings these claims against Defendants as a result of Defendants' theft, through fraud and misrepresentation, of Plaintiff's trade secrets.

2.      Plaintiff seeks injunctive relief and damages in excess of one million dollars ($1,000,000), with the amount to be determined at trial.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Helio's cause of action under the DTSA, 18 U.S.C. § 1832 *et seq.*, presents a federal question.

4.      This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). The state claims asserted herein are intimately related to the DTSA claim, are built on the same factual predicates, and are part of the same case and controversy.

5.      This Court has personal jurisdiction over Defendants because, as set forth herein, Defendants transact business in this District, have misappropriated Plaintiff's property in this District, and have caused tortious injury to Plaintiff in this District.

6.      The exercise of personal jurisdiction comports with Defendants' right to due process because they have purposefully availed themselves of the privilege of conducting activities in this District, such that they should reasonably anticipate being haled into court here.

7.      Venue for this action is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred in this district.

## PARTIES

8.      Plaintiff is a Delaware corporation with a principal place of business at 2448 Broadway #1158 New York, New York 10583.

9.      Defendant Apoorva Mehta is a citizen of California residing at 421 Crown Road, Kentfield, California 94904.

2

10.      Defendant Sunrise Health is a Delaware corporation with a principal place of business at 850 New Burton Road, Suite 201, Dover, Delaware 19904.

11.      Defendant Tejasvi Singh is a citizen of New Jersey residing at 184 Ryan Road, Marlboro, New Jersey 07746. Tejasvi is the brother of Riddhi Singh.

12.      Defendant Riddhi Singh is a citizen of California residing at 574 Governor's Avenue, Stanford, California 94305. Riddhi Singh is the sister of Tejasvi Singh.

## **STATEMENT OF FACTS**

Formation of Helio

13.      Robert Epstein ("Epstein") is the founder and Chief Executive Officer of Helio Logistics, Inc. ("Helio"). Helio also does business under the trade name NextMed. Helio is a digital healthcare company which connects patients to doctors, in particular for the purpose of receiving treatment for medical weight loss.

14.      In December of 2020, Epstein invited Tejasvi Singh to join as a co-founder of Helio.

15.      Tejasvi accepted Epstein's offer, and joined Helio as a co-founder, executing a Common Stock Purchase Agreement ("CSPA") and accepting a large equity stake in Helio. Upon information and belief, Tejasvi also signed an Advisor Agreement which included a confidentiality and non-disclosure agreement, on or about October 4, 2020.

16.      As part of, or in conjunction with, the CSPA, Tejasvi signed an intellectual property agreement and did not list any owned intellectual property.

17.      In February of 2021, Epstein developed a relationship with Dr. Marc Serota ("Serota") and Serota executed a partnership and consulting agreement with Helio with a duration of two years.

18.     After the partnership agreement was executed, Epstein introduced Serota to Tejasvi. Tejasvi then facilitated introductions of Serota to venture capital providers, for the purpose of building Serota's relationship with Helio.

19.     In or about March of 2021, Epstein and Tejasvi created a "pitch deck" – a marketing presentation consisting of confidential material – to be presented to potential investors. This pitch deck included detailed specifics about the HbA1c testing and diabetes care that Helio provides, and a roadmap of where Helio intended to venture.

20.     Epstein thereafter presented his company to a round of potential investors including CRV, Floodgate, Bessemer, Altos, XYZ, Afore, Forerunner, Inspired, Gradient, First Round, Shine, Great Oaks, and Uncorrelated Ventures.

21.     This round of soliciting investment proved unsuccessful and Helio received no offers for investment.

<u>Tejasvi's Departure from Helio</u>

22.     In April of 2021, Epstein exercised his re-purchase option and bought back all of Tejasvi's equity in Helio, which Tejasvi signed.

23.     The Intellectual Property Agreement between Tejasvi and Helio remained in effect after Tejasvi's termination and sale of equity in Helio.

24.     Tejasvi thereafter worked for Coatue Management, LLC ("Coatue"), an investment management company.

25.     After Tejasvi's departure from Helio, Epstein continued to develop and improve Helio's healthcare workflow and software capabilities, without any assistance or influence from Tejasvi.

26.      On or about January 21, 2022, Tejasvi introduced Epstein to an investor named Bryan Baum ("Baum"), a managing partner of the venture capital firm K5 Global Holdings ("K5").

27.      On or about January 23, 2022, Bryan Baum offered Helio a term sheet to lead its seed round of investment for three million dollars.

28.      At this time, upon information and belief, Tejasvi was working closely with Bryan Baum by sourcing potential investment deals for him.

29.      At this time, upon information and belief, Tejasvi was still an employee of Coatue.

30.      At this time, upon information and belief, Tejasvi was attempting to secure Bryan Baum as an investor for Tejasvi's emerging company called JetWallet, which subsequently changed its name .

31.      On or about February 16, 2022, Tejasvi had incorporated  on his behalf JetWallet, and received a million-dollar seed investment from K5.

32.      To avoid scrutiny from his employer, Coatue, Tejasvi had his sister, defendant Riddhi, who on information and belief had no actual connection to JetWallet incorporate JetWallet in her name for Tejasvi, due to this activity violating his employment agreement with Coatue and Tejasvi not wanting to report it. Upon Information and belief all of Tejasvi initial equity in JetWallet was owned by his sister Riddhi.

33.      Upon information and belief, during the time Tejasvi was working for Coatue, Tejasvi was actually living a double life and  living with Bryan Baum in Baum's Los Angeles home.

34.     Upon information and belief, K5's initial investment in JetWallet came in the form of a convertible note because, at that time, JetWallet had no formal business idea and no revenue.

35.     Upon information and belief JetWallet converted to a corporation and changed its name to Jet Tech Inc,  in October 2022 when FTX , whom Tejasvi had developed a deep relationship with led an equity round Jet Wallet's despite JetWallet still having no business plan.

36.     Upon information and belief, Tejasvi had worked for months out of FTX's Bahamas headquarters and oversaw significant product development and significant projection of code on specific projects allocated by Sam Bankman-Fried.

37.     Upon information and belief, Riddhi transferred her sham equity in JetWallet to Tejasvi right before the FTX investment.

Tejasvi's Fraud and Deception

38.     Beginning in or about March of 2022, Helio launched its medical weight loss service. Helio began testing website designs, checkout flows, and marketing funnels extensively.

39.     In or about May of 2022, Tejasvi represented to Epstein that Tejasvi had departed Coatue to work directly for K5 and FTX. Tejasvi told Epstein of Tejasvi's salary from K5 as an "investment associate." Tejasvi sat two desks away from Samuel Bankman-Fried ("SBF," the CEO of FTX) working on special projects for FTX and SBF directly.

40.     From May of 2022 through August of 2022, Tejasvi constantly asked Epstein about the state of Helio's business, its progress, its vendor relations, financial data, and other trade secrets.

41.     In or about July of 2022, Helio pivoted its entire business model to medical weight loss, and ceased advertising any other programs. Helio saw immense growth, and Tejasvi Singh became far more interested in Helio's business than previously.

42.     Upon information and belief, Tejasvi was inquiring about Helio so frequently in an attempt to use Helio's trade secrets to improve Tejasvi's own company, JetWallet.

43.     During this time, Tejasvi told Epstein, explicitly and on multiple occasions, that Tejasvi was an employee and agent of K5. Tejasvi was also being paid an approximate $400,000 annual salary by K5, and Tejasvi referenced this in text messages with Epstein as being a K5 employee. In addition, Bryan Baum confirmed this relationship.

44.     In the same conversations as those referenced in paragraph 46, Tejasvi asked Epstein about Helio's specific business metrics, including its gross margin, details on vendor costs and Helio's relationships with vendors, Helio's run rate, Helio's insurance authorization processes and eligibility, and other confidential specifics of Helio's business.

45.     Based on Tejasvi's misrepresentations, Epstein believed Tejasvi was inquiring into Helio's confidential information as part of K5's due diligence efforts in preparation for offering an investment to Helio.

46.     During these conversations, Tejasvi informed Epstein of Tejasvi's unlawful solicitation of confidential information from other companies to compare them to Helio.

47.     On or about the end of August 2022, Tejasvi began working out of Epstein's apartment at 305 W 13th street, New York, New York. Tejasvi worked out of Epstein's apartment and Epstein's parents' home with him in Amagansett, New York on several other occasions in September 2022 and October 2022.

48.     Upon information and belief, Tejasvi did so to observe Epstein and Helio's Chief Operations Officer, Frank Leonardo, conduct Helio's business in an effort to solicit marketing advice and confidential information on Helio.

49.     On or about September 18, 2022, Tejasvi informed Epstein and Baum that Tejasvi intended to start a menopause care company for the Kardashians, whom Baum had an existing business relationship with. Tejasvi stated that this company was the new business idea for JetWallet.

50.     Immediately thereafter, on or about September 28, 2022, Epstein informed Tejasvi, in writing, that Tejasvi's menopause company would be in competition with Helio and, therefore, Tejasvi was prohibited from moving forward. Robert wrote: "There r. A Billion business ideas. Why do something that's going to compete w me and was my idea." Tejasvi ignored the request and instead sent screenshots of a conversation with his sister, Riddhi, asking for a lab order for diagnostic testing from Helio. This conversation appeared manufactured and, upon information and belief, was a way for Tejasvi to learn more about how the laboratory ordering process works which is integral to medical weight loss.

51.     Soon after, on a Zoom conference between Tejasvi, Epstein, and Baum, Tejasvi displayed the website Tejasvi had "created" for his company. This website was essentially an exact clone of Helio's, with some colors and fonts changed.

52.     In this same Zoom conference, Tejasvi gloated about how quickly and easily he copied Helio's website.

Mehta Joins Tejasvi in Defrauding Helio

53.    On or about September 23, 2022, Tejasvi introduced Epstein to Apoorva Mehta ("Mehta"), the  founder of Instacart. Tejasvi explicitly stated to Epstein that the purpose of the introduction was to discuss Mehta's idea for a new company, and nothing more.

54.    Mehta was fired as Instacart CEO in 2021 and was forced out by Sequoia as Chair of the Board in 2022. His former CFO joined Sequoia in 2019 and worked with Mike Moritz to remove Mehta. Following Mehta's removal, Instacart slashed its bloated valuation three times. Mehta was also involved in a significant class action lawsuit for stealing claimed tips from customers in 2019.

55.    Mehta represented to Epstein that he was considering creating a pharmacy company, and Epstein explained why he thought such a company would not be successful.

56.    Mehta and Epstein agreed to stay in contact as Mehta considered the future of his pharmacy company idea.

57.    On or about September 26, 2022, Mehta and Epstein had a conversation over Zoom to discuss further ideas for the pharmacy company.

58.    At no time did Epstein discuss Helio's business, weight-loss, or any related ideas with Mehta. Epstein discussed his new company he had started independently of NextMed, which Apoorva expressed interest in investing in. On October 3, 2022, Robert informed Apoorva he was closing a seed round and asked if Apoorva wanted to invest in the new company. Apoorva indicated he wanted to chat more to discuss with him and asked Robert if he had a deck for the new company. Robert then sent a screenshot of the conversation to Tejasvi to ask if Apoorva's messages appeared hesitant to invest, to which Tejasvi explained he may be on the fence and encouraged Robert to speak to him. Apoorva and Robert then continued discussions with Robert soliciting an investment in an unrelated financial technology business from Apoorva.

59.     On or about October 4, 2022, Epstein and Mehta again spoke over Zoom to discuss ideas for the pharmacy company and allowing Robert to pitch his new business. At no point did Epstein discuss Helio's business, weight-loss, or any related ideas with Mehta.

60.     On or about October 5, 2022, Tejasvi informed Epstein during a Zoom conference that K5 wanted to invest in Helio.

61.     During the October 5, 2022, conversation, Tejasvi told Epstein that Tejasvi would need certain confidential information on Helio as part of his due diligence efforts for K5's investment in Helio.

62.     Tejasvi informed Epstein that, in order to move forward with investment from K5 in Helio, Tejasvi would need access to Helio's Stripe account – Helio's sole payment processor, as well as detailed marketing information on each channel they used

63.     Based on Tejasvi's representations, Epstein provided Tejasvi with the Stripe access on October 5, 2022, which allowed Tejasvi to see Helio's confidential information and trade secrets such as Helio's client list, Helio's web traffic and advertising data analytics, Helio's revenue mix, Helio's products mix, Helio's churn data, customer emails, customer phone numbers, lifetime value ("LTV"), models and discounts, customer demographics, sales patterns for both time-of-day and day-of-week, and other extremely sensitive information.

64.     Tejasvi further requested Helio's confidential marketing information, including its customer acquisition costs ("CAC"), its average revenue per unit ("ARPU"), marketing channels, and other sensitive information.

65.     Helio's CAC, ARPU, marketing channels, client list, revenue mix, products mix, churn data, customer emails, revenue mix, Helio's products mix, Helio's churn data, customer

emails, LTV, models and discounts, customer demographics, and sales patterns (the "Protected Information") are closely held by Helio and not generally available to the public.

66.     At all times during this conversation with Epstein Tejasvi represented and maintained that these materials and information were necessary to secure investment from K5.

67.     On or about October 6, 2022, Mehta and Epstein again met to discuss Mehta's pharmacy company idea. At no point during this conversation did they discuss Helio, weight-loss, or related ideas.

68.     During the October 6, 2022, conversation, Mehta requested to meet with Helio's legal counsel. Epstein set up a meeting between Mehta and Helio's legal counsel for October 10, 2022, for the purpose of discussing co-founding of a new company, in the medical billing space.

69.     As Epstein was in discussions with Mehta, Tejasvi presented an extremely detailed pitch deck to K5 and sought K5's valuation of Helio at $265 million.

70.     Tejasvi's presentation to K5 was composed entirely of data and information Tejasvi received during his meetings and discussions with Epstein.

71.     At this time, Tejasvi was working from his family home in New Jersey.

72.     Upon information and belief, Tejasvi's family, including his sister Riddhi Singh, his father Kapoor Singh, and his mother Sushma Singh, had access to Helio's confidential information that Tejasvi had already obtained, in the home office of Kapoor Singh's company IvyGuruKul.

73.     Upon information and belief, Tejasvi's sister Riddhi aided Tejasvi's efforts to scam Epstein and Helio, in the offices of IvyGuruKul.

74.     During the week of October 10, 2022, Epstein spoke with Mehta at least six times, during all of which Mehta represented that he wanted to co-found a company with Epstein based on their pharmacy ideas, distinct and unrelated from Helio and any weight-loss company.

75.     On or about October 12, 2022, Tejasvi and Mehta purchased the domain joinsunrise.com in an effort to begin conspiring against their presumed competitor, Helio. On or about October 18, 2022, Tejasvi and Mehta purchased the findsunrise.com domain.

76.     At the same time, Tejasvi continued to ask Epstein for information and data on Helio in order to build a competitor to Helio, under the guise of due diligence necessary for K5's investment in Helio.

77.     On or about October 15, 2022, Mehta asked Epstein to formally co-found a new business with Mehta. Epstein responded that he would meet Mehta in San Francisco to discuss further.

Defendants' Conspiracy to Defraud Helio Comes to Light

78.     Immediately thereafter, Mehta stopped all contact with Epstein and stopped responding to Epstein entirely.

79.     On or about October 19 of 2022, Tejasvi encouraged K5 to exit its completed deal to invest in Helio.

80.     On or about October 25 of 2022, Tejasvi quit his job as associate at K5 to focus on the new company with Mehta, as well as FTX.

81.     It was at this time that Epstein came to understand that Mehta and Tejasvi had engaged in a prolonged scheme to deceive and trick Epstein into believing that Mehta was looking to be business partners with Epstein, and that Tejasvi was promoting Helio to K5 for investment—

when in truth and in fact, Tejasvi and Mehta schemed to manipulate Helio and Epstein into sharing confidential information.

82.     Tejasvi and Mehta have defrauded and intentionally deceived Epstein, through material misrepresentations and omissions, to turn over a wide array of confidential information and trade secrets for use by Defendants.

83.     Using the data and information they stole from Helio, Tejasvi and Mehta had been conspiring to construct an exact replica of Helio.

84.     Apoorva and Helio have been soliciting Helio vendors, many of whom they have already contracted with and have been in testing.

85.     Tejasvi and Mehta are pitching their exact replica to Helio investors. Upon information and belief, they raised $20-30M at a $200M post money valuation from Thrive Capital and Josh Kushner, as well as Green Oaks and Neil Mehta, despite Robert informing Josh and Neil via email that the deck they saw was stolen intellectual property.

86.     Using this exact replica, Tejasvi and Mehta have secured term sheets from venture capital firms, using a pitch deck that is extremely similar to Helio's.

87.     The Sunrise Health website was clearly copied from Plaintiff's as can be seen from the screenshots below of Sunrise Health's html code, which reference Plaintiff's trade name "NextMed":



88.     On October 31, 2022, Helio, through its undersigned counsel, sent litigation hold notices informing the recipient of the conduct alleged herein to the following individuals: Apoorva Mehta, Dhruv Sachdev, Riddhi Singh and Tejasvi Singh.

89.     The purpose of these letters was to instruct all recipients to place a litigation hold on potentially relevant documents and information relating to this litigation.

90.     Following the letters, several weeks of settlement negotiations between the parties ensued.

<u>Sunrise Health's Deceptive Acts and Trade Practices</u>

91.      The joinsunrise.com website went live on or about, November 15, 2022.

92.     Sunrise Health has fabricated reviews in an effort to bolster the credibility of their company and the services it provides. Sunrise Health also fabricated news articles that were never published. Sunrise Health also included fake testimonials from Billio.com from people who

clearly never took nor qualified for the medications. Below is a screenshot taken from Sunrise

Health's website at https://www.findsunrise.com/#faq  as it appeared on November 25, 2022.



93.     The reviews depicted in the above screenshot are fraudulent or stolen directly

from Helio's real customer reviews exactly.

**COUNT I:**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1832 *et seq.*)**
**(ALL DEFENDANTS)**

94.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

95.     The facts pled above constitute actual misappropriation of trade secrets by Defendants in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.,* in one or more of the following respects.

96.     Helio's trade secrets misappropriated by Defendants, including Helio's client list, revenue mix, products mix, churn data, and customer emails, among other extremely sensitive information, are related to telehealth services used in interstate commerce.

97.     Defendants have used and disclosed, and will continue to use and disclose, Helio's trade secrets to solicit investment at the expense of Helio.

98.     The trade secrets belonging to Helio that were misappropriated by Defendants have been subject to reasonable efforts by Helio to maintain their secrecy and confidentiality. Helio's trade secret information is not generally known nor available to the public.

99.     Helio's confidential information is considered a trade secret under the DTSA because Helio derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

100.    Helio used efforts that were reasonable under the circumstances to maintain the confidentiality and protection of its trade secrets. Plaintiff took reasonable measures to protect and maintain the secrecy of the Protected Information including, but not limited to, not disclosing the

Protected Information to third parties, restricting access to the Protected Information, and storing files which include trade secrets, including the Protected Information, on secured devices.

101.     Defendants knew at the time they used and/or disclosed Helio's trade secret information that such information had been obtained and/or acquired through improper means: specifically, deceit, fraud, and deception. Defendants' knowledge that the information was obtained through improper means is based on, among other things, the non-public nature of the information, the deceptive and untruthful means by which Defendants solicited the information from Helio, and the cease-and-desist letter sent to each Defendant informing them of the same.

102.     Defendants continue to misappropriate Helio's trade secret information by continuing to solicit Helio's investors using this information, and by failing to return and/or destroy the confidential information.

103.     Helio continues to face an immediate threat of irreparable harm, for which it lacks an adequate remedy at law, from Defendants' ongoing misappropriation of Helio's trade secrets.

104.     Unless Defendants are preliminarily and permanently enjoined from the foregoing conduct, Helio will be irreparably harmed by:

      A.  Loss of confidentiality and trade secret status of information regarding Helio's customers, investment deals, and other business-sensitive information;

      B.  Imminent loss of customers and relationships with investors;

      C.  Imminent loss of goodwill; and

      D.  Current and future economic loss, which is currently incalculable.

105.     Defendants' misconduct constitutes a willful and malicious misappropriation of Helio's trade secrets.

106.     Helio is entitled to preliminary injunction and permanent injunctive relief permanently enjoining Defendants from misappropriating, disclosing, or otherwise using Helio's trade secrets, including but not limited to the Protected Information.

107.     Helio is further entitled to restitution, compensatory damages, and attorneys' fees pursuant to 18 U.S.C. §§ 1832 and 1836.

**COUNT II:**
**COMMON LAW MISAPPROPRIATION OF TRADE SECRETS**
**(ALL DEFENDANTS)**

108.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

109.     Helio's Protected Information constitutes trade secrets.

110.     The Protected Information includes Helio's customer list and other confidential information.

111.     Helio derives independent economic value from its Protected Information not being generally known, or readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

112.     Helio has taken significant measures to maintain the confidentiality and secrecy of its Protected Information, including but not limited to restricting access to the Protected Information.

113.     As described herein, Defendants improperly converted and used the Protected Information to, among other things, solicit Helio's investors away from Helio for their own benefit,

18

after obtaining, through deception, fraud, and deceit, the Protected Information that Defendants knew was improperly obtained.

114.     By virtue of the alleged conduct, Defendants misappropriated Helio's trade secrets in violation of New York common law.

115.     As a direct and proximate result thereof, Helio has been and will continue to be irreparably harmed unless Defendants are enjoined from further misappropriation.

116.     Further, Defendants' misappropriation of Helio's trade secrets has and will continue to damage Helio as described herein, in an amount to be determined at trial.

## COUNT III:
## FRAUDULENT INDUCEMENT
## (ALL DEFENDANTS)

117.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully written herein.

118.     Defendants, acting in concert with one another, represented to Helio, through its CEO Epstein, that disclosure of the Protected Information was a necessary step in K5's due diligence process for the securing of an investment into Helio by K5.

119.     Defendants, acting in concert with one another, represented to Helio, through its CEO Epstein, that Tejasvi was an agent of K5 authorized to obtain the Protected Information on K5's behalf, for the sole purpose of assessing K5's potential investment into Helio.

120.     Upon information and belief, Defendants were never required or even authorized by K5 to solicit the Protected Information on its behalf.

121.     Upon information and belief, Defendants were not authorized by K5 to obtain the Protected Information for Defendants' use.

122.    Plaintiff would not have given access to the Protected Information had they known that Defendants were not authorized by K5 to obtain the Protected Information for Defendants' use.

123.    Upon information and belief, Defendants intended to deceive Plaintiff into disclosing the Protected Information.

124.    Defendants' statements and representations were materially false and misleading as set forth above.

125.    Defendants knew, had reason to know, and/or were reckless in not knowing that these representations were false when Defendants made them.

126.    Defendants deliberately made such misrepresentations, omissions, and false statements to induce Helio to disclose the Protected Information.

127.    Helio relied, to its detriment, on Defendants' misrepresentations and false statements by disclosing the Protected Information where no true prospect of an investment from K5 existed.

128.    Helio's reliance on Defendants' misrepresentations and false statements were both reasonable and justifiable, since Helio had no reason to doubt the truthfulness of Defendants' representations.

129.    As a direct and proximate result of relying on Defendants' misrepresentations and false statements, Helio was damaged as discussed herein.

130.    As a result of Defendants' actions, absent an order by the Court, Helio would be damaged by having the Protected Information continue to be misappropriated and in Defendants being allowed to derive economic value therefrom

131.     Helio is entitled to an award of damages in an amount to be proven at trial, but no less than $1,000,000, plus attorneys' fees and costs.

## COUNT IV:
## FRAUDULENT CONCEALMENT
## (ALL DEFENDANTS)

132.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

133.     Defendants failed to disclose material information to Plaintiff. Specifically, Defendants concealed their intent to use the Protected Information to start a business in competition with Helio and solicit investors away from Helio. Defendants further concealed the fact that they were not acting on behalf of K5 in requesting the Protected Information.

134.     Upon information and belief, Defendants, purposefully omitted this material information in an effort to obtain the Protected Information from Helio.

135.     As parties to the conversation and acts in which Defendants acquired the Protected Information from Helio, Defendants had a duty to disclose complete and accurate information relating to their intent to build a competing business with Helio, and their authority to act on behalf of K5.

136.     Upon information and belief, Defendants knew material information was purposefully omitted, and/or that a material misrepresentation was made, and did so with the intent to deceive Helio.

137.     Upon information and belief, Defendants knew their omission and/or misrepresentation was material.

138.     Helio relied to its detriment on Defendants' misrepresentations and false statements by disclosing the Protected Information where no true prospect of an investment from K5 existed.

139.     Helio's reliance on Defendants' misrepresentations and false statements were both reasonable and justifiable, since Helio had no reason to doubt the truthfulness of Defendants' representations.

140.     As a direct and proximate result of relying on Defendants' misrepresentations and false statements, Helio was damaged as discussed herein.

141.     As a result of Defendants' actions, absent an order by the Court, Helio would be damaged by having the Protected Information continue to be misappropriated and in Defendants being allowed to derive economic value therefrom

142.     Helio is therefore entitled to an award of damages in an amount to be proven at trial, but no less than $1,000,000, plus attorneys' fees and costs.

### COUNT V:
### FRAUDULENT MISREPRESENTATION
### (ALL DEFENDANTS)

143.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

144.     Upon information and belief, Defendants failed to disclose material information of their intent to build a business in competition with Helio, and their ability or authorizations to act on behalf of K5.

145.     Upon information and belief, Defendants purposefully omitted this material information in an effort to obtain the Protected Information from Helio.

146.     As parties to the conversation in which Defendants acquired the Protected Information from Helio, Defendants had a duty to disclose complete and accurate information relating to their intent to build a competing business with Helio, and their authority to act on behalf of K5.

22

147.     Upon information and belief, Defendants knew material information was purposefully omitted, and did so with the intent to deceive Helio into disclosing the Protected Information.

148.     Upon information and belief, Defendants omitted such information to induce and deceive Helio into providing the Protected Information.

149.     Helio relied to its detriment on Defendants' misrepresentations and false statements by disclosing the Protected Information when no true prospect of investment existed.

150.     Helio's reliance on Defendants' misrepresentations and false statements were both reasonable and justifiable, since Helio had no reason to doubt the truthfulness of Defendants' representations.

151.     As a direct and proximate result of relying on Defendants' misrepresentations and false statements the Helio was damaged as discussed herein.

152.     As a result of Defendants' actions, absent an order by the Court, Helio would be damaged by having the Protected Information continue to be misappropriated and in Defendants being allowed to derive economic value therefrom.

153.     Plaintiff is entitled to an award of damages in an amount to be proven at trial, but no less than $1,000,000, plus attorneys' fees and costs.

## COUNT VI:
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (ALL DEFENDANTS)

154.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

155.     Helio had a business relationship with its investor K5.

156.     As described herein, Defendants interfered with Helio's relationships with K5 and by using Helio's misappropriated trade secrets to their own benefit to solicit K5 as an investor away from Helio.

157.     Defendants' conduct interfered with Helio's relationships with its investor K5 by using the misappropriated trade secrets to encourage K5 to cease investment in Helio and instead invest in Sunrise Health.

158.     As alleged herein, Defendants acted with the sole purpose of harming Helio's business and benefiting their own.

159.     Defendants acted with malice and tried to harm Helio's business in its communications with K5.

160.     As alleged herein, Defendants' misconduct caused Helio monetary damages to be calculated at trial and non-monetary damages in the form of loss of goodwill, among other things.

## COUNT VII: UNFAIR COMPETITION
### (ALL DEFENDANTS)

161.     Plaintiff re-alleges and incorporates by reference the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

162.     Helio invested considerable time and resources in developing the Protected Information into a valuable asset.

163.     Defendants have taken the Protected Information for themselves and have disclosed and/or used the Protected Information without the authorization or permission of Helio.

164.     Defendants made unauthorized use of the Protected Information which they purloined for their own benefit and to the detriment of Helio.

165.     As a consequence, Helio has been and continues to be harmed.

166.     Defendants' conduct constitutes common law unfair competition and was carried out willfully, fraudulently, maliciously, with the intent to deceive Helio, and with wanton disregard of Helio's rights.

167.     Helio is therefore entitled to compensatory and punitive damages in an amount to be proven at trial.

## COUNT VIII: USURPING CORPORATE OPPORTUNITY
### (AS TO TEJASVI SINGH)

168.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

169.     As described herein, Tejasvi exploited Helio's Protected Information and diverted investment opportunities from Helio for his own benefit.

170.     As described herein, Helio has been damaged as a result of Tejasvi's exploitation and diversion of Helio's business opportunities.

171.     By virtue of the forgoing conduct, Defendant Tejasvi has violated New York's Corporate Opportunity Doctrine.

172.     Helio is therefore entitled to damages in an amount to be determined at trial.

## COUNT IX: CIVIL CONSPIRACY
### (ALL DEFENDANTS)

173.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

174.     Defendants Tejasvi Singh and Riddhi Singh conspired with one another to achieve a common, unlawful purpose, including the commission of the torts and statutory violations alleged herein.

175.     As alleged above, Tejasvi and Riddhi Singh each committed an overt act in furtherance of the common scheme and each of them committed or otherwise participated in the above-alleged torts and statutory violations in furtherance of that scheme.

176.     Accordingly, each of them is jointly and severally liable for civil conspiracy, including any damages sustained by Plaintiff in connection with Defendants' commission of tortious or other unlawful acts.

**COUNT X: DECEPTIVE ACTS AND PRACTICES UNDER NEW YORK GENERAL BUSINESS LAW §§ 349 AND 350 (NY GBL §§ 349 AND 350) (AS TO SUNRISE HEALTH)**

177.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

178.     Sunrise Health's website, https://www.findsunrise.com/#faq, contains fake and fabricated reviews supposedly posted by its clientele. In addition Sunrise Health's website includes fake articles.

179.     Upon information and belief, Sunrise Health has not serviced a single customer to date.

180.     Through the advertisement of its services via its website, which includes fabricated reviews by its clientele, Sunrise Health has engaged in consumer-oriented conduct that has directly or indirectly affected the public interest of New York and has resulted in injury to consumers of New York.

181.     Sunrise Health's acts complained of herein are materially misleading to a substantial portion of the consuming public and have deceived and/or are likely to deceive a material segment of the consuming public to whom Sunrise Health has directed its conduct. Upon information and belief, multiple consumers were deceived by the fake reviews.

26

182.     Through the acts complained of herein, Sunrise Health has willfully engaged in deceptive acts or practices in the conduct of business in violation of NY GBL §§ 349 and 350.

183.     Plaintiff has no remedy at law.

184.     Plaintiff has suffered and will continue to suffer economic loss directly and proximately caused by Sunrise Health's actions as alleged herein.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

A.  Granting permanent injunctive relief requiring Defendants to return to Helio all property belonging to Helio, including but not limited to the Protected Information, in Defendants custody, care, and/or control, or to which Defendants have access and, as to any such property containing electronically stored information (ESI), inform Helio of all such ESI so that it can permanently delete or destroy and eliminate access to such information by Defendants and any and all persons acting in concert with them;

B.  Granting permanent injunctive relief enjoining Defendants and all persons acting in concert with them from accessing, disclosing, using, or otherwise misappropriating Helio's confidential information and trade secrets;

C.  Awarding Helio direct, compensatory, and consequential damages in an amount to be determined at trial, to compensate Helio for the losses it suffered by Defendants' usurpation of joint venture opportunity, together with punitive damages;

D.  Awarding Helio reasonable attorneys' fees and costs, and;

E.  Awarding Helio such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment, Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: November 25, 2022
New York, New York

Respectfully submitted,


By:     /s/ Serge Krimnus
      Andrew D. Bochner, Esq.
      Serge Krimnus, Esq.
      andrew@bochnerip.com
      serge@bochnerip.com
      Bochner IP, PLLC
      295 Madison Ave, 12th Fl.
      New York, NY 10017
      (646) 971-0685

      *Attorneys for Plaintiff*