## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HELIO LOGISTICS, INC. d/b/a NEXTMED, | ) | |
| | ) | |
| Plaintiff, | ) | No.: 7:22-cv-10047-NSR |
| | ) | |
| -against- | ) | |
| | ) | Hon. Nelson S. Román |
| APOORVA MEHTA, CLOUD HEALTH SYSTEMS, | ) | |
| LLC d/b/a SUNRISE HEALTH, and TEJASVI SINGH, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### VERIFIED AMENDED COMPLAINT

Plaintiff Helio Logistics, Inc. d/b/a NextMed ("NextMed"), by and through its undersigned counsel, brings this action against Defendants Apoorva Mehta ("Mehta"), Cloud Health Systems, LLC d/b/a Sunrise Health ("Sunrise"), and Tej Singh ("Tej") (collectively, "Defendants") and alleges as follows:

### INTRODUCTION

1.      This action concerns Defendants' fraudulent, pernicious, and tortious conduct in stealing Plaintiff NextMed's trade secrets to launch a copycat business that competes directly with NextMed.

2.       NextMed, led by its entrepreneurial young founder, Robert Epstein, is an innovative and highly successful healthcare startup. NextMed connects customers with physicians and pharmacists for weight-loss treatments, offering subscription services that include prescriptions like Ozempic®, doctor consultations, and weight loss plans.  Barely out of

college, Epstein guided his company to emerge with a game-changing weight loss enterprise that caught the eyes of top venture capital investors and customers alike.

3.        NextMed also caught the eye of Defendant Apoorva Mehta, the billionaire founder of Instacart.  Wanting in on NextMed's success, and in search of venture capital funding for a new project, Mehta teamed up with a peripatetic former friend, confidante, and business partner of Epstein's, Defendant Tejasvi Singh ("Tej"), to do what Mehta later said he considered "unethical but not illegal"—create a copycat company, Defendant Sunrise, that was launched off of NextMed's stolen trade secrets, including NextMed's proprietary business model, payment structure, marketing and advertising data, customer data, and other highly sensitive and confidential information.

4.        As Mehta knew well, Tej had been stockpiling NextMed's trade secrets for years. He was a co-founder of NextMed, and then an advisor to NextMed, with non-disclosure and confidentiality obligations to NextMed, as he moonlighted for other companies including the beleaguered cryptocurrency exchange FTX.  And most recently, he worked for a VC firm, K5 Global ("K5"), that had previously invested in NextMed, and was intending to invest additional funds in NextMed. Indeed, in the months leading up to Sunrise's launch, Tej extracted some of NextMed's closest-held secrets under the guise of gathering information about NextMed for K5's and other firms' investment diligence process.  It took Epstein and his team two years and several million dollars to develop NextMed's customer base, marketing strategies, customer acquisition strategies, and all other key facets of their business.  But through theft of NextMed's trade secrets, Mehta and Tej were able to create their copycat website, line up vendors (including NextMed's most important third-party consultant), and then implement NextMed's hard-earned and highly confidential customer acquisition and other strategies, in mere weeks.

5.      Indeed, through flat out deceit and fraud, Tej and Mehta acquired the keys to the proverbial castle, including NextMed's most confidential trade secrets, such as its client list, customer information, post-purchase workflows, pricing structure, internal processes, vendor relations, customer acquisition costs, channel-by-channel marketing analysis, sales patterns, web traffic, advertising data analytics, and other business strategies it had worked hard and expended substantial resources to develop.  Mehta, an extremely sophisticated startup founder and former coder in his own right, knew how valuable all of this information was.  That's why, after acquiring this information, he and Tej started their weight loss telehealth company that is attempting to steal NextMed's market share.

6.      Mehta and Tej launched their new company, Sunrise, a few weeks ago.  Indeed, Sunrise already raised $30 million at a $200 million post money valuation from two of the nation's highest profile venture capital firms, Thrive Capital (run by Josh Kushner), and Green Oaks (founded by Neil Mehta), all on the back of NextMed's closest-held business secrets, confidential information, and strategies.

7.      Sunrise offers exactly the same services and business model as NextMed, and the Sunrise site is live and competing with NextMed for funding, customers, and advertising, all while trying to undercut NextMed on pricing.  In fact, just this past Friday, December 16, 2022, Sunrise launched a paid advertising campaign on Facebook and Google with ad copy that is lifted *verbatim* from NextMed's ("Book your initial assessment in minutes.  Get prescribed same-day and start losing weight.  Change your life today."). Hence, there is an immediate and compelling need for emergency relief here to put a stop to Defendants' ongoing and accelerating misconduct causing irreparable injury to NextMed's business.  Indeed, even a cursory review of the Sunrise website demonstrates Defendants' blatant misappropriation in ripping off NextMed's business:

Plaintiff NextMed's Business Screenshot:          Defendants' Copycat Business Screenshot:



**1. Physician Consultation**

A certified medical doctor will review your BMI, health history and craft your weight loss plan with prescription medication.

① **Doctor Consultation**

Tell us about yourself and your medical history. Our board certified physician will review your information and speak with you to design a program peronalized for your needs.

⬜ Everything happens on your phone

♋ Board-certified clinicians with years of experience

⊘ Dedicated customer support



**2. Get Medication**

Shipped to your home or pick up at your local pharmacy. Prescribed within 24 hours of insurance approval.

② **Prescription Medication**

Based on your medical history, our physicians may provide you the prescriptions that uniquely address your biological needs while also reducing your co-pay.

⬭ Monthly subscription for 7+ FDA approved weight loss medications (Wegovy, Ozempic, Mounjaro, Contrave and more)

FDA Pick up at your local pharmacy or have them delivered

⚗ We work with your insurance to keep co-pay low





### 3. Lose Weight

We are the only program that includes regular doctor visits and quarterly lab testing to see how you're progressing.



   America's #1 Weight Loss Experts©

## Personalized, Doctor-Backed
# Weight Loss Medicine.

Book your initial assessment in minutes. Get prescribed same-day and start losing weight. **Change your life today.**

## Doctor-led & Individualized
# Weight Loss Program

Same-day doctor visits and prescriptions for Ozempic, Wegovy, and other GLP weight-loss medications. **Reset your weight now.**

8.      Prior to creating Sunrise with Mehta, Tej had been juggling a full-time job with moonlighting for multiple entities for years.  In 2020, while Tej was working full-time for a venture capital firm, Coatue Management, LLC ("Coatue"), Tej also joined NextMed as a co-founder and later as an advisor.   Through his multiple roles at NextMed, Tej understood NextMed's fundamentals and why it was succeeding, including confidential business strategies that took NextMed two years, and millions of dollars, to develop.

9.      After a few months of working with NextMed, Epstein and Tej agreed that Epstein would buy back all of Tej's equity in NextMed because Coatue did not allow Tej to have equity in another business while he worked at Coatue.  Tej nevertheless declared to Epstein that he would remain an "Advisor Emiritas [sic]" to NextMed even after Epstein bought him out.  Tej also

requested a 1% equity interest in NextMed, but only "under the table" to evade Coatue's rules against employees not reporting equity in start-up companies.

10.   Tej later began working closely with the venture capital firm, K5.  Tej introduced Epstein to K5 in January 2022, and, within two days, K5 offered NextMed a term sheet to lead its seed round of investment for $3 million.

11.   In or about May 2022, Tej left Coatue, telling Epstein he joined K5 as an employee earning $350,000 per year.  Tej pitched himself to Epstein as K5's mouthpiece and salesperson who had significant influence over the deals K5 would pursue.  In other words, Tej purported to be able to help NextMed secure funding from K5.

12.   In May 2022, NextMed's business took off and Tej's interest in NextMed grew exponentially.  Over the next five months, Tej repeatedly told Epstein and NextMed that he needed NextMed's confidential information so K5 could complete due diligence on NextMed to determine whether it could offer additional funding to NextMed at a far higher valuation.  Relying on these and other representations from Tej and his repeated assurances that he remained an advisor of NextMed, Epstein gave Tej unfettered access to NextMed's trade secrets (including detailed information on NextMed's vendor relations, channel-by-channel marketing efforts, customer acquisition costs, post-purchase flows, internal processes, workflows, and pricing structure) and other information. Epstein's disclosure was to allow K5 to complete the due diligence necessary for it to invest in NextMed.

13.   But Tej had other plans for the confidential data and trade secrets he was accessing from NextMed.  Unbeknownst to Epstein, Tej was stockpiling NextMed's trade secrets so that he could launch his own company—founded on the very same highly confidential strategies and data

that Epstein only shared with Tej in his capacity as a co-founder and advisor of NextMed and, later, as a K5 consultant and continuing advisor to NextMed.

14.     Tej continued to misappropriate NextMed trade secrets through the fall of 2022.  In blatant disregard of his confidentiality and non-disclosure obligations to NextMed (not to mention his work for K5), Tej passed all of NextMed's confidential data and trade secrets to Mehta.  Mehta, a founder of startups (including Instacart) and former engineer at Amazon, knew that companies do not simply hand over their highly confidential proprietary information.  While Mehta knew that Tej acquired NextMed's trade secrets through improper means, Mehta saw an opportunity to cheat his way to the top of a booming industry.

15.     Apparently satisfied that they had extracted all of the NextMed trade secrets they needed to get Sunrise off the ground, Tej moved into Mehta's Marin County home to help launch Sunrise together using the trade secret information they had stolen from NextMed. To keep Epstein from getting suspicious while they started the business, Tej told Epstein he went to California for personal reasons relating to his sister. Tej told Epstein not to tell anyone, including K5, that he was in California.  Epstein became suspicious of Tej's story after close friends informed him that Tej was working with Mehta in the downtown San Francisco Green Oaks venture capital office.

16.     At the same time, Tej began intentionally interfering with NextMed's existing business relationship with K5 and encouraged K5 to reduce the amount of its investment from over $30 million to $4-5 million.  K5 ultimately cut its investment in NextMed to $20 million. Believing he had weakened his soon-to-be competitor NextMed, Tej stopped working with K5 to work full-time on Sunrise.

17.     With help from an engineer with whom both Epstein and Tej were friendly, Abhinav Karale ("Abhi"), Mehta and Tej launched Sunrise, creating a nearly identical replica of

NextMed's website and business. While Epstein and his team at NextMed worked over several *years* to develop its trade secrets, Defendants' theft allowed them to launch Sunrise just *weeks* after completing their theft.  Indeed, at Mehta's and Tej's urging, it took Abhi—armed with NextMed's proprietary information and closest-held strategies—less than two weeks to create the back-end code that became Sunrise.  In fact, several portions of the Sunrise website were lifted directly from NextMed's, including reviews copied word-for-word and html code directly referencing NextMed's website. With NextMed's trade secrets, Sunrise immediately had all it needed to secure $30 million in funding from Josh Kushner at Thrive Capital and Green Oaks. Sunrise has access to and was able to utilize pitch materials that it copied from NextMed's fundraising efforts.

18.     Because Defendants stole NextMed's trade secrets and committed other unlawful acts damaging to NextMed, Sunrise is now able to siphon customers, business opportunities, and investments away from NextMed.  Indeed, since Sunrise launched, NextMed's costs have sharply increased, its sales have decreased, and investors have communicated new hesitations about investing in NextMed because of Sunrise's entry into the market.

19.     Defendants' unlawful conduct threatens NextMed's ongoing success and viability. Accordingly, NextMed now seeks (i) a temporary restraining order and preliminary injunction to prevent Defendants from continuing to use NextMed's trade secrets during the pendency of this action, (ii) expedited discovery in furtherance of that emergency relief application to expose the full extent of their misconduct, (iii) a permanent injunction to shut down Sunrise, (iv) to the extent calculable, money damages, and (v) such other relief as this Court deems just and proper.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because NextMed's Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq.*, copyright infringement, and infringement of trade dress causes of action present a federal question.

21.     This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).  The state law claims asserted herein are intimately related to the DTSA, copyright infringement, and infringement of trade dress claims, are built on the same factual predicates, and are part of the same case and controversy.

22.     This Court has personal jurisdiction over Defendants because, as set forth herein, Defendants transact business in this District, have misappropriated NextMed's property in this District, and have caused tortious injury to NextMed in this District.

23.     The exercise of personal jurisdiction comports with Defendants' right to due process because they have purposefully availed themselves of the privilege of conducting activities in this District, such that they should reasonably anticipate being haled into court here.

24.     Venue for this action is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein, including Defendant Tej's theft of NextMed's trade secrets, occurred in this District.

## PARTIES

25.     Plaintiff Helio Logistics, Inc. d/b/a NextMed is a Delaware corporation with its principal place of business located at 2448 Broadway #1158, New York, New York 10024.

26.     Upon information and belief, Defendant Apoorva Mehta is a citizen of California residing at 421 Crown Road, Kentfield, California 94904.

27.     Upon information and belief, Defendant Sunrise is a Delaware corporation with its principal place of business located at 850 New Burton Road, Suite 201, Dover, Delaware 19904.

28.     Upon information and belief, Defendant Tej Singh is a citizen of New Jersey residing at 184 Ryan Road, Marlboro, New Jersey 07746.

## STATEMENT OF FACTS

### A.     NextMed's Business

29.     Epstein is the 23-year-old founder and Chief Executive Officer of NextMed, an innovative and booming healthcare startup.

30.     Founded in August 2020, NextMed is a digital healthcare company that connects customers with physicians and pharmacies for weight-loss treatments, offering subscription services that include weight loss prescriptions, doctor consultations, and weight loss plans.

31.     Using its innovative and proprietary materials, NextMed now serves customers in all 50 states and Washington, D.C.

### B.     In Late 2020, Tej Joins NextMed as a Co-Founder and Advisor, Gaining a Detailed Understanding of NextMed's Confidential Business Strategies

32.     In or around August 2017, Tej and Epstein met in college and became close friends. They frequently discussed co-founding a venture together at some point in the future.

33.     In 2020, after Tej and Epstein graduated, Tej was working full-time for the venture capital firm Coatue. Tej also joined NextMed as a co-founder and later as an advisor.

34.     To that end, on or about October 4, 2020, Tej entered into an Advisor Agreement with NextMed under which Tej agreed to act as an advisor to NextMed and to provide certain advice and assistance to NextMed as mutually agreed by the parties.  Exhibit A.  As an advisor, Tej's role included soliciting and acquiring investments for NextMed, which required Tej to learn NextMed's proprietary information.  Consequently, the Advisor Agreement contained confidentiality and non-disclosure provisions protecting NextMed's trade secrets.  Section 6(a) of Tej's Advisor Agreement with NextMed provided as follows:

6.  **Nondisclosure of Confidential Information**

(a)  **Agreement Not to Disclose.**  Advisor agrees not to use any Confidential Information (as defined below) disclosed to Advisor by the Company [i.e., NextMed] for Advisor's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services. Advisor shall not disclose or permit disclosure of any Confidential Information of the Company to third parties.  Advisor agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information.  Advisor further agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of the Company's Confidential Information which may come to Advisor's attention.

35.     On October 20, 2020, Tej told Epstein: "When NextMed gets big, we should just acquire Noom [a weight-loss company], or just rip them off and make our own app." At around the same time, Tej told Epstein the goal of NextMed was to become: "Uber + the largest D2C healthcare store + Noom + Living + Hims," and also told Epstein: "You need to look into Noom… that Co is killing it." This was the first of many times the two had discussed the medical weight loss market.

36.     In or around December 2020, Tej executed a Common Stock Purchase Agreement pursuant to which Tej accepted an equity stake in NextMed.  Exhibit B.

37.     As an advisor and co-founder of NextMed, Tej learned and understood NextMed's fundamentals and why it was succeeding, including confidential business strategies that took NextMed years, and millions of dollars, to develop.  Epstein shared NextMed's trade secrets with Tej in part because he had signed the Advisor Agreement, which contained strict nondisclosure requirements.

38.     One of NextMed's key vendors was a telehealth consulting company, which was founded by Dr. Marc Serota. NextMed entered into a Partnership and Consulting Agreement with Dr. Serota in February 2021. At the time, Dr. Serota had informed Epstein that he was in the

process of creating his own, separate telemedicine consulting business. To assist Dr. Serota, Epstein introduced him to Tej, who then introduced Dr. Serota to venture capital providers to assist Dr. Serota raise money for his business. In connection with these discussions, Epstein shared information with Tej about NextMed's favorable rate agreements with Dr. Serota, as well as how Epstein worked with Dr. Serota to conduct telehealth consultations at a lower fixed cost than most competitors at the time.

39.     In or around March 2021, Epstein and Tej spent considerable time developing a pitch deck to be presented to potential investors of NextMed.  The pitch deck was a marketing presentation that included details about the HbA1c testing and diabetes care that NextMed then provided, as well as a roadmap of the direction in which NextMed was heading.  During the process of working on the pitch deck and soliciting investors, Tej told Epstein, "if [NextMed] takes off, then im gonna be happy" because Tej's "theoretical shares are worth a lot."

40.     Shortly thereafter, Epstein presented NextMed to a round of potential investors, including CRV, Floodgate, Bessemer, Altos, XYZ, Afore, Forerunner, Inspired, Gradient, First Round, Shine, Great Oaks, and Uncorrelated Ventures.  NextMed did not receive any offers for investment during this solicitation round.

**C.     In April 2021, Tej Departs from NextMed but Remains an Advisor**

41.     After months of working with NextMed, Tej decided to depart from NextMed.  On March 13, 2021, Tej asked Robbie: "Can u please cut me to 0 equity?"  Epstein and Tej agreed that Epstein would buy back all Tej's equity in NextMed for a nominal amount because Coatue did not allow him to have undisclosed equity in another business while he worked at Coatue.

42.     Just prior to leaving NextMed, Tej informed Epstein that he would remain an advisor to NextMed even after his departure.  On March 15, 2021, Tej confirmed that he was still

an "advisor" to NextMed, and said that he would become "Advisor Emiritas [sic]" if an employer of his objected to his "advisor" title.

43.     Epstein exercised his repurchase option in April 2021 and bought back all of Tej's equity in NextMed, which Tej signed.   Nonetheless, Tej requested a 1% equity interest in NextMed, but "under the table" to evade Coatue's rules against holding equity in startup companies.  As Tej claimed to Epstein at the time: "bro.  I still have equity [in NextMed] . . . Just not on paper."

44.     After Tej departed from NextMed, Epstein worked for many months to continue to develop and improve NextMed's healthcare workflow and software capabilities.

**D.     Tej Works on K5's Behalf Before Becoming a K5 Consultant**

45.     After Tej left NextMed, he kept his full-time job at Coatue but increasingly spent his time working on side jobs with multiple entities.

46.     To that end, after departing NextMed, Tej began working closely with the venture capital firm K5, sourcing potential investmentf deals on its behalf.

47.     On or about January 21, 2022, Tej introduced K5's managing partner, Bryan Baum, to Epstein.  Two days later, on January 23, 2022, K5 offered NextMed a term sheet to lead its seed round of investment for $3 million.

48.     Tej also attempted to secure K5 as an investor for Tej's new personal company, JetWallet, which at that time had no formal business plan or revenue.

49.     Tej incorporated JetWallet on or about February 16, 2022.  By this time, he had already received a seed investment of at least $1 million from K5.  On information and belief, K5 later invested a total of $4 million in JetWallet.

50.     Tej also worked closely with Sam Bankman-Fried ("SBF") of the beleaguered cryptocurrency exchange FTX, who gave Tej at least $500,000 in FTX equity or cash in return for

time Tej was spending working on so-called "special projects" from FTX's Bahamas headquarters for FTX and SBF personally. Indeed, Tej told Epstein that at times, he was working on more than thirteen of FTX's "special projects" simultaneously.

51.     In or around March 2022, NextMed launched its medical weight loss service, offering its service to customers for the first time.  NextMed began testing website designs, checkout flows, and marketing funnels extensively.

52.     Tej left his full-time job at Coatue in or around May 2022 to work with K5.  Tej told Epstein that K5 had hired him as an "investment associate" and was paying him approximately $350,000 per year.

53.     Tej pitched himself to Epstein as K5's mouthpiece and salesperson.  According to Tej, he had tremendous influence over the deals K5 would pursue.  Thus, Tej purported to help NextMed secure additional funding from K5.

**E.      Beginning in the Summer of 2022, Tej Steals NextMed's Trade Secrets Under the Guise of Doing Diligence for K5**

54.     In July 2022, NextMed made the strategic decision to alter its business model. NextMed pivoted its primary focus to medical weight loss, and significantly reduced advertising other programs, which led to NextMed's rapid growth. Tej took notice of NextMed's success, and his interest in NextMed's business grew exponentially.

55.     Much of NextMed's growth was built on its development of its proprietary information. NextMed exercised strict security measures to keep its trade secrets confidential. Only three employees (including Epstein and NextMed's Chief Operations Officer, Frank Leonardo) currently have access to NextMed's confidential information, and all are under strict rules and confidentiality obligations to not disclose the information other than for investment purposes. Further, all NextMed employees and agents must sign nondisclosure and confidentiality

agreements. To the extent any of NextMed's confidential information is electronically stored, it is secured with passwords.

56.     Tej thus could not access NextMed's trade secrets directly. Instead, over the next several months, Tej repeatedly told Epstein that he needed NextMed's confidential information to complete due diligence on NextMed for K5 to determine whether K5 could offer additional funding to NextMed.  Tej also told Epstein he needed the information in connection with at least one other potential venture capital investment.  To this end, Tej relentlessly sought highly sensitive information from Epstein about NextMed's medical weight loss business, including detailed information concerning NextMed's vendor relations, financial data, and other trade secrets.  Tej and Epstein interacted multiple times per day during this period as Tej asked Epstein detailed questions about NextMed's gross margin, run rate, internal processes, and other confidential information about NextMed's business.

57.     Relying on these representations from Tej and his repeated assurances that he remained an advisor of NextMed (which included confidentiality obligations), Epstein gave these NextMed trade secrets to Tej for the purpose of determining whether K5 would give NextMed more funding (and how much).  However, unbeknownst to Epstein, Tej was collecting NextMed's trade secrets so that Tej could also develop and ultimately launch his own competing company— founded on the very same highly confidential strategies and data that Epstein shared with Tej in his capacity as a co-founder and advisor of NextMed and now as a consultant of K5's.

58.     Tej obtained many of NextMed's trade secrets while working directly with Epstein in the same physical location.  Beginning in late August 2022 and continuing for several months thereafter, Tej often worked in Epstein's West 13th Street apartment in New York City while Epstein focused on growing NextMed's business.  Tej also worked with Epstein from the home of

Epstein's parents on several occasions. On August 28, 2022, Tej told Epstein that he was no longer willing to communicate with him on anything other than an encrypted and self-deleting line. He told Epstein that it was an FTX and K5 standard protocol and convinced Epstein to download Signal where messages were automatically deleted after a period of time.

59.     By directly observing Epstein and NextMed's COO, Leonardo, conduct NextMed business during this period, Tej was able to get a first-hand look at how NextMed's business operated as he continued to devise his plan to develop his own competing company.  Indeed, even outside the presence of Epstein, Tej pressed Leonardo on how NextMed produces its display ads in an effort to gain more insight into NextMed. At the time, Epstein did not find these discussions problematic as Tej stated he remained an advisor to NextMed.

60.     In or about September 2022, Epstein discussed NextMed's activity in the menopause space with Tej.  Epstein suggested to Tej and Baum that a menopause company may be a good idea for a celebrity family whom K5's owners had an existing business relationship with at the time.  Epstein told Tej that he personally did not feel the need to create a business with a celebrity partner, and instead would continue to focus on building menopause as a part of NextMed and its original investors. In response, Tej cut Epstein out of the process, pitched Epstein's idea to partner with the celebrity family to Baum, and then started to build his own menopause website.

61.     Upon learning that Tej forged ahead with the menopause business idea, Epstein questioned why Tej would pursue an idea that would result in Tej's business competing with NextMed—which had already launched its own menopause-related website.  As Epstein wrote to Tej in late September 2022: "There r. A Billion business ideas. Why do something that's going to compete w me and was my idea."

62.     Around that time, Tej worked with his sister to request a lab order for diagnostic testing from NextMed.  On information and belief, Tej and his sister were looking to learn about the laboratory ordering process, which was crucial in the medical weight loss space, in connection with Tej's plans to copy NextMed.

63.     Shortly thereafter, during a Zoom teleconference, Tej showed Epstein and Leonardo the website he had "created" for his new menopause company.  Epstein was shocked that the website Tej screenshared during that call was an almost identical copy of NextMed's website, built by Tej's favorite user interface designer, Dhruv Sachdev.  Epstein told Tej to take the website down and stop competing with NextMed in the menopause space.

**F.      In the Fall of 2022, Tej Introduces Epstein to Mehta While Tej Obtains Additional NextMed Trade Secrets Under the Guise of Doing Diligence for K5**

64.     Through the fall of 2022, Tej continued to misappropriate NextMed trade secrets under the guise of asking for information in connection with K5's diligence process.  Tej shared NextMed's confidential data and trade secrets with Mehta, who used them to develop and launch Sunrise—despite his knowledge that Tej had obtained NextMed's trade secrets through improper means.

65.     On September 23, 2022, Tej introduced Epstein to Mehta, informing Epstein that the purpose of the introduction was to discuss Mehta's idea for a new company he was considering in the consumer healthcare space.

66.     Epstein then spoke to Mehta for several hours, in which Mehta told Epstein that Mehta was thinking about creating a pharmacy company that would provide drug delivery through local pharmacies.  Although Epstein explained to Mehta why Epstein thought this business idea would not be successful, Epstein and Mehta agreed to stay in contact as Mehta considered the future of his pharmacy company idea.

67.     On or about September 26, 2022, Mehta and Epstein had a conversation over Zoom to discuss further ideas for the pharmacy company.  Epstein told Mehta about a new medical billing company Epstein had started independently of NextMed, called Tempo Claims, and Mehta expressed interest in working on or investing in this new company.

68.     On October 3, 2022, Epstein informed Mehta that he was closing a $4 million seed round with K5 at a $35.5M valuation for Tempo Claims and asked if Mehta wanted to invest in it. The seed round closed on October 4.  In fact, Tej had played a significant role in gathering the seed round for Tempo Claims, including orchestrating the entire diligence process and negotiations—which boosted Tej's credibility with Epstein as Tej continued to ask for additional NextMed trade secrets throughout the fall of 2022. Mehta stated that he wanted to chat more about Tempo Claims with Epstein and asked if Epstein had a pitch deck for Tempo Claims.

69.     On or about October 4, 2022, Epstein and Mehta again spoke over Zoom to discuss Mehta's ideas for a pharmacy company, and Epstein again solicited his interest in Tempo Claims.

70.     The following day, on or about October 5, 2022, Tej informed Epstein during a Zoom conference that K5 had agreed to invest additional funds in NextMed.  To facilitate K5's investment in NextMed, Tej told Epstein that he would need even more confidential information from NextMed as part of the diligence process.

71.     Tej informed Epstein during the Zoom conference that K5 could not move forward with its investment in NextMed unless Epstein provided Tej with access to NextMed's password-protected Stripe account—which was the file that held much of NextMed's most sensitive customer information.  Tej also told Epstein that he would need detailed marketing information on each channel used by NextMed, in connection with Tej's due diligence work for K5.

72.     Based on Tej's representations (as well as Tej's ongoing nondisclosure obligations as an advisor to NextMed), Epstein provided Tej with access to NextMed's Stripe account on October 5, 2022, allowing Tej to see NextMed's confidential information and trade secrets such as NextMed's client list, web traffic and advertising data analytics, revenue mix, products mix, churn data (i.e., the percentage of customers that stopped using NextMed's services during specific time frames), contact information, lifetime value, product discounts, demographics, sales patterns for both time-of-day and day-of-week, and other extremely sensitive information.

73.     Stripe later confirmed that after NextMed provided Tej with Stripe access, Tej accessed its Stripe account at least twice from an IP address of a computer located at his parents' home in New Jersey.  To say Tej had a leg up for his own weight loss business by accessing NextMed's Stripe account would be a massive understatement.  With NextMed's Stripe data, Tej knew exactly which customers to target and how.

74.     But Tej did not stop there.  Tej further requested, still under the guise of needing it solely for K5's due diligence, NextMed's confidential marketing information, including its customer acquisition costs (i.e., how much NextMed spent to acquire new customers), its average revenue per unit (i.e., the amount of money NextMed makes from selling one of its products on a unit basis), and channel-by-channel marketing analysis.  This marketing information was the "secret sauce" that drove NextMed's success.  Once Tej obtained it, he had a roadmap for exactly what to do to create a successful medical weight loss company.  NextMed provided this sensitive marketing information to Tej in the form of a spreadsheet, which Tej accessed.  To this day, the spreadsheet (which is housed in the cloud) indicates that it was "last edited" by Tej on October 8, 2022.

75.     In connection with his purported diligence of NextMed for K5, Tej also asked Epstein how NextMed achieved low customer acquisition costs.  Epstein shared with Tej detailed information about NextMed's marketing and pricing strategies and user experience that contributed to lower customer acquisition costs, known as CACs. Tej similarly asked Epstein extremely specific and detailed questions about remote patient monitoring and how to roll out a program of his own.  Epstein gave Tej this sensitive information as well, again believing he needed it to complete K5's diligence of NextMed and to derive a fair valuation of the business.

76.     NextMed's proprietary information that Tej acquired included its customer emails, client list, customer acquisition costs, average revenue per unit, marketing channels, revenue mix, products mix, churn data, lifetime value, models and discounts, customer demographics, and sales patterns. Only Epstein and Leonardo have full access to this information, which is not available to the public.  Moreover, NextMed requires any employee working with any of this confidential NextMed information to sign non-disclosure and non-compete agreements. All of this information is held in secure cloud-based accounts controlled by NextMed.

77.     Tej subsequently presented an extremely detailed pitch deck to K5 and sought K5's valuation of NextMed at $265 million.  Tej's presentation to K5 was composed of the proprietary data and information he had received during his meetings and discussions with Epstein while purporting to conduct diligence for K5.

78.     On or about October 6, 2022, Mehta and Epstein again met to discuss Mehta's pharmacy company idea.  Mehta asked to meet with NextMed's legal counsel to discuss co-founding, rather than investing in, Epstein's new medical billing company.  Epstein then set up the meeting for this purpose.

G.    **In or Around October 2022, Tej and Mehta Develop Sunrise in Secret Using the Trade Secrets Tej Had Stolen From NextMed**

79.    During the week of October 10, 2022, Epstein spoke with Mehta at least six times. During each of these discussions, Mehta represented to Epstein that he wanted to co-found a company with Epstein based on their pharmacy ideas.  Mehta said that the medical billing business he was discussing with Epstein was a much better idea than running a medical weight loss business.

80.    On October 12, 2022, armed with NextMed's trade secrets, Tej and Mehta purchased the domain joinsunrise.com in connection with their copycat weight loss company that would be in direct competition with NextMed.

81.    On or about October 15, 2022, Mehta asked Epstein to formally co-found the medical billing business with him, even though Mehta was moving full speed ahead to build Sunrise using the NextMed trade secrets Tej had given him.  Epstein told Mehta that he would meet him in San Francisco to discuss the co-founding idea further.

82.    But Epstein's trip to San Francisco never happened.  Instead, Mehta suddenly cut off all communications with Epstein, and instead continued to work with Tej on Sunrise using the confidential NextMed information Tej had stolen.

83.    On October 20, 2022, Cloud Health Systems—the formal corporate name for Sunrise—was incorporated as a Delaware LLC.

84.    Mehta knew that Tej acquired NextMed's trade secrets through improper means. Notably, Mehta was a coder who had formerly worked for Amazon as a logistical engineer and thus was uniquely qualified to replicate NextMed's business using the "shortcuts" Tej had given him.

85.    During October 2022, Tej and Mehta also enlisted the help of Tej's friend from college, Abhinav Karale ("Abhi"), to develop the back end of Sunrise as a coder.  At the time,

Abhi was already a consultant of Tej's company JetWallet and, on information and belief, had a confidentiality agreement with JetWallet and/or K5.

86.     Abhi agreed to assist with Sunrise because he knew Mehta was involved and it gave Abhi an opportunity to impress Mehta.  Tej and Mehta pushed Abhi to build the Sunrise website as quickly as possible.  Abhi noticed that Mehta was extremely focused on checking boxes to get to the next step in Sunrise's progression.

87.     When Abhi was initially engaged by Mehta and Tej to develop the Sunrise website, Abhi understood their initial idea to be developing a company in the menopause space.  But during a meeting that included Abhi, Mehta, and Tej shortly after Abhi joined the Sunrise team, Mehta suddenly announced that Sunrise would be switching exclusively to medical weight loss, away from menopause.  In that same meeting, Tej shared highly specific medical weight loss data—which had been stolen from NextMed.  In that same meeting, Tej also shared detailed information on the marketing channels that were working well for NextMed as well as the customer acquisition costs and lifetime value of a customer of NextMed.

88.     As Tej and Mehta pivoted entirely to medical weight loss, they implemented NextMed's stolen trade secrets.  For example, they implemented NextMed's flow for intake of new customers and when NextMed collected payment from them.  Abhi wrote source code implementing those stolen strategies.  The team even went so far as to copy images directly from NextMed's website without changing its source first, leaving 'nextmed' on parts of the html code of the website.  On information and belief, Abhi knew, at the time, that Tej wrongly acquired those strategies from Epstein and NextMed.

89.     Tej and Mehta also told Abhi that Sunrise would be contracting with NextMed's key vendor, MD Integrations, which was controlled by Dr. Serota. Epstein had introduced Tej to

22

Dr. Serota in early 2021, and in his capacity as an advisor, Tej had access to the terms of the deal between Dr. Serota and NextMed, including the amount that Dr. Serota charged NextMed for its customers' consultations.  On or about October 19, 2022, Sunrise engaged Dr. Serota and MD Integrations.  Later, Tej told Epstein that Sunrise was paying Dr. Serota three times as much as NextMed was for the same services.

90.     Shortly after Sunrise retained Dr. Serota at a rate higher than it charged NextMed, Dr. Serota requested from NextMed a five-fold increase in the rate NextMed was currently paying him. This 5x rate was almost double the amount Sunrise was paying Dr. Serota. This sudden increase in NextMed's expenses as to MD Integrations was caused by Sunrise's engaging with Dr. Serota.

91.     Due to Dr. Serota's demand for a five-fold increase in payment following Defendants' engagement with MD Integrations and Dr. Serota, NextMed forecasts having to pay over an additional $100,000 *per day* to MD Integrations over the next year than NextMed was previously paying—*i.e.*, a 400% increase in costs associated with MD Integrations.

**H.     In October 2022, Tej Also Attempts to Interfere with K5's Fundraising in NextMed**

92.     As Tej and Mehta prepared to launch Sunrise, Tej also began materially interfering in the business relationship between K5 and NextMed.

93.     On or about October 19, 2022, Tej called Epstein and informed him that while Tej had been negotiating with K5 to receive up to 20% carry in any deal between K5 and NextMed, Tej had recently learned that those negotiations were unsuccessful, which infuriated Tej.  During the call, Tej encouraged Epstein to exit NextMed's deal with K5.

94.     Between October 21 and 23, 2022, Tej's behavior became increasingly erratic, and he began calling Epstein non-stop.  Indeed, during this two-day timeframe, Epstein received

approximately 16 phone calls from Tej over Signal (an encrypted text and phone application), some of which Epstein answered. On these calls, Tej began to plant doubt in Epstein's mind about the valuation he was receiving from K5 for their investment. Tej mentioned that he had spoken to his former boss at Coatue and that businesses received much higher revenue multiples than NextMed was receiving from K5. Tej also lobbed a series of ad hominem at Epstein, calling Epstein a "little b****" and saying he had "no backbone" for proceeding with the K5 transaction. Tej further told Epstein that he "could do better" and that he should "f*** over Bryan" (Baum, of K5) because K5 is a "s*** fund" that Epstein should not associate himself with.  Tej even claimed to have a "moral obligation" to help Epstein secure a better deal.

95.     Epstein consequently got the impression that K5 was getting cold feet about its deal with NextMed.  After all, because Tej was unhappy with his personal return on the deal, he was badmouthing K5 to Epstein while simultaneously telling K5 that its investment in NextMed was no longer worth pursuing.  Soon after Tej's October 19, 2022 call with Epstein, K5 cut the amount it was willing to invest in NextMed from $30 million to $20 million.  Tej was, on information and belief, attempting to block NextMed's access to capital to clear a path for Sunrise to take market share in the medical weight loss space away from NextMed.

96.     On or about October 25, 2022, Tej stopped working with K5 to focus on building Sunrise with Mehta.

**I.     Defendants' Scheme Is Exposed**

97.     On or about October 27, 2022, Baum (of K5) called Epstein and told him that essentially Tej had essentially stolen K5's money, referring to the fact that K5 had given Tej $4 million for JetWallet but that Tej had used $1 million of those funds for extravagant Michelin restaurant dinners for himself and others rather than for the purpose of growing JetWallet.  Baum

also told Epstein that Tej had traveled to San Francisco to form a company with Mehta, though Epstein did not yet know that Tej and Mehta were seeking to copy and compete with NextMed.

98.     Shortly thereafter, it began to become clear that Tej had been lying.  Indeed, around this time, Epstein also learned through two of his close contacts at Green Oaks that Tej was working out of the Green Oaks office in San Francisco with Mehta, despite Tej telling Epstein that he was in California for personal reasons.

99.     Epstein came to realize that Mehta and Tej had engaged in a prolonged scheme to deceive Epstein into believing that Mehta was looking to be business partners with Epstein, and that Tej was promoting NextMed to K5 for investment—when, in truth, they had been manipulating NextMed and Epstein into sharing confidential information so that Tej and Mehta could create Sunrise.

100.    Tej and Mehta intentionally and illegally acquired and used NextMed's trade secrets for their personal gain. Using the data and information they stole from NextMed, Tej and Mehta had conspired to construct an almost exact replica of NextMed.

101.    NextMed has borne immense costs to develop its successful strategies and business model.  For example, NextMed has spent over $8.75 million on advertising to date, which has involved rigorous A/B testing, multivariate analysis, and landing page optimizations to test NextMed's flows. NextMed has also employed more than 10 full-time software engineers for two years, and each earns a salary of approximately $200,000-300,000 per year. Moreover, NextMed has incurred over $600,000 to date in medical consulting fees to craft its clinical workflows, systems, and processes. NextMed has spent significant monetary and labor costs to conduct its beta testing, learning processes to reduce its churn rate, retain customers, and build flows and processes that are friendly, high throughput, and compliant.  Indeed, NextMed has 150+ employees

and contractors who work on its business, comprising customer service representatives, operations, product/marketing, nurse practitioners, medical doctors, and developers.  These figures do not even include the intangible costs related to Epstein, Leonardo, NextMed's investors and advisors, and other core team members who work substantial hours each week to constantly refine NextMed's processes.

102.    But Tej, Mehta, and Sunrise purport to have developed this same information for Sunrise in just a matter of weeks.

103.    On or about October 29, 2022, upon learning that Tej was entering the medical weight loss space through Sunrise, Epstein spoke with Tej.  Tej told Epstein that he was living and working with Mehta and that Tej "needed to get out of this." Around this time, Tej also had a conversation with K5, who informed Epstein that Tej admitted to copying NextMed's website and to giving Mehta the entire roadmap to NextMed.  Tej said there was no way to undo what he had done.

104.    On October 31, 2022, Tej called Epstein and Leonardo via Facetime and provided extremely specific details to them about his scheme to defraud NextMed. Tej said that the purpose of Mehta's earlier calls with Epstein had really been to obtain additional information concerning NextMed's weight loss business. Tej said that the Sunrise website "was already finished, and there is nothing that can stop it." Tej further stated that he had stolen NextMed's confidential information and trade secrets at the direction of Mehta, who Tej said would "probably fire" Tej before he received any vested equity. Tej also showed Epstein and Leonardo Mehta's Marin County, California home on this video call, where Tej claimed to be living and working with Mehta. Tej called Mehta a "shark" who personally directed Tej to steal NextMed's trade secrets because he thought he "could do it better" than NextMed.

105.   The Sunrise site launched on or about November 15, 2022. It remains live today.

106.   Critically, investment opportunities are extremely limited for startups, and a failure to obtain sufficient funding can result in the company's demise.  As Sunrise is now a competitor to NextMed because of Defendants' misappropriation of NextMed's trade secrets, NextMed is in competition with Sunrise for this essential funding.

107.   Indeed, Tej and Mehta have already pitched their exact replica of NextMed to venture capital investors.

108.   Upon information and belief, Tej and Mehta already raised $30 million at a $200 million post money valuation from Thrive Capital and Josh Kushner, as well as Green Oaks and Neil Mehta. NextMed was also considering seeking investments from those same two firms (Thrive Capital and Green Oaks)—and now, that investment opportunity is lost to NextMed.

109.   Defendants' actions have not just resulted in NextMed having to compete for limited investment opportunities. Defendants' theft of NextMed's trade secrets has, by itself, hindered NextMed in acquiring new investment capital. For example, shortly after NextMed filed its original complaint to enjoin Defendants' unlawful actions, one investor who was seriously considering investing in NextMed walked away because NextMed was "too easy to copycat." This investor's outlook, however, arose only after the investor learned about Defendants' misappropriation and fraud. Similarly, while K5 initially intended to hold an additional fundraising round of $30 million for NextMed, that never came to pass, in part because of this lawsuit.  Thus, Defendants' theft is affecting NextMed by demonstrably discouraging investors from investing in NextMed.

110.   Moreover, Tej and Mehta have communicated with some of the exact same advertisers and vendors that NextMed uses, despite it taking many months and expenses for

NextMed to conduct sufficient market research to determine which advertisers and vendors would result in the greatest return for the business.  Sunrise has already begun to advertise its nearly identical services.

111.   What is more, Sunrise has also copied NextMed's advertising strategy.  As shown on the first page of Exhibit C, Sunrise's search advertisements that ran, at the latest, between November 25 and November 27, 2022 used a nearly identical headline and description text as NextMed's search advertisements.  The NextMed advertisement headline reads: "$99 Ozempic Buy Now – Same-Day Prescription Online."  The headline for the Sunrise advertisement reads: "$49 Ozempic & Wegovy Buy Now – Prescribed Within 15 Minutes."  Both start with a specific dollar amount, followed by a reference to the weight loss drug Ozempic and the phrase "Buy Now," and end with a reference to an immediate prescription for the potential consumer.  The text below the headline is also nearly identical.  The NextMed advertisement states, "Members Lose 53+ lbs Without Diet or Exercise," "Personalized, Doctor-Backed," and "Order Now!" Likewise, Sunrise's advertisement includes the phrases, "Members Lose 50+ lbs Without Diet or Exercise," "Personalized & Doctor Led,"  and "Buy Now!"  Both advertisements use the phrase "Change Your Life."   Just this past Friday, December 16, 2022, Sunrise launched a paid advertising campaign on Facebook and Google with ad copy that is lifted verbatim from NextMed's.  Both advertisements read:  "Book your initial assessment in minutes.  Get prescribed same-day and start losing weight.  Change your life today."  Exhibit C at 2–3.

112.   Sunrise also stole NextMed's strategy for video advertisements.  Exhibit D shows a comparison of the video advertisements for NextMed and Sunrise.  Both advertisements begin with before-and-after pictures of Kim Kardashian as the background with a young woman in the

foreground talking to the camera.  The women are even dressed similarly, wearing short-sleeve crop top shirts and pants in the beginning of the video, and bikini-style swimsuits at the end.

113.    The script for Sunrise's video is plagiarized sentence-by-sentence from NextMed's video advertisement:

      a.      NextMed script:  "Don't you ever wonder what's the secret celebrities use to lose weight? And no it's not by special exercise or diet.  It's by using special medication like Wegovy that controls your hunger. Next Medical makes it super easy to get these prescriptions online. Just take an online quiz and they prescribe you within 24 hours. I've been able to lose 21 pounds thanks to Next Medical. Go check them out today."

      b.      Sunrise script: "Have you ever wanted to know the secret that all the celebs use to lose weight? Curve ball, it's not by dieting or working out. Thank god. By taking new miracle weight loss pills that help you control your hunger.  Just approved by the FDA. And Sunrise makes it so easy to get your prescriptions on the web. You just take a quick quiz and a doctor will prescribe to you within 24 hours. I lost over 30 pounds thanks to Sunrise. Go check them out now so you can start losing weight without losing your mind."

114.    Additionally, both NextMed and Sunrise provide a subscription-based service in the medical weight loss field, which is a relatively new—but fast-growing—industry.  Therefore, there are many "new" customers interested in this service.  The essential component of a subscription service is that the service is a continuing one (hence, the subscription)—once a customer enrolls in the service, the essence of a subscription service is that the customer remains with that company.  Thus, every new customer that subscribes with Sunrise is a potentially permanent lost opportunity for NextMed.  Sunrise is already targeting the same customers as

NextMed (including via third-party advertisements) in an attempt to permanently lure those customers away from NextMed.

115.    Further, Defendants' unlawful conduct has already impacted NextMed's sales and revenue. NextMed anticipated this year's Black Friday weekend to be very successful, as Black Friday is widely known as the biggest shopping day of the year across all industries. Yet in the three days (i.e., Black Friday weekend) that Sunrise and NextMed were both advertising on Google, NextMed's overall subscriptions *dropped* and its customer acquisition costs *increased*, week-over-week.  In other words, in what was expected to be one of the most successful weekends in NextMed's history, NextMed's performance actually declined week-over-week. The only difference between the Black Friday week and the prior week was that Sunrise began to compete with NextMed for customers.

**J.      Defendants Have Unlawfully Copied NextMed's Website**

116.    The Sunrise website, including its design and how it functions, was clearly copied from NextMed. The visuals provided above in the Introduction demonstrate that websites contain the same three-step process for obtaining medical weight loss treatment as well as nearly identical language describing the services provided by NextMed and Sunrise (*e.g.*, "Doctor-led & Personalized" vs. "Personalized, Doctor-Backed").  As the screenshot below shows, Sunrise's html code even referenced "NextMed" originally:



117.    NextMed created, authored, designed, coded, produced, and maintains a website to sell its products and services over the Internet, accessed via the domain name "joinnextmed.com." NextMed owns the exclusive right, title, and interest in literary, content, and copyright rights in and to the NextMed website.

118.    NextMed's website is registered under Certificate of Registration No. VAu001487902 filed on December 5, 2022.   The protected content of the NextMed website shall herein be referred to as "the Copyright."   The Copyright protects the text of the NextMed website. Exhibit E shows the Copyright's registration as listed in the online public catalog hosted by the United States Copyright Office.

119.    The NextMed website was launched in October 2020. NextMed has invested substantial time, expense, and resources in the creation, development, and authorship of the NextMed website.   This includes time spent by NextMed employees on improving the website, as well as money spent on coding and developing all the content for the site.   Since launching the NextMed website, NextMed has promoted the site through social media, paid advertising, and

other marketing avenues. This has required a substantial investment in advertising by NextMed. Those advertisements emphasize NextMed's color scheme, font, and website design.

120.    A substantial amount of NextMed's business comes from its web sales.

121.    Sunrise owns and operates a website accessible via the domain name https://www.findsunrise.com/.

122.    The Sunrise website launched on or about November 15, 2022.

123.    The Sunrise website contains a number of features that are substantially similar, if not identical, to the NextMed website.

124.    The landing page of the two websites are near-mirror images.  Exhibit F is a comparison of the key features of the landing pages.  Both have the same banner design at the top of the page, with a logo on the lefthand side and a contact method on the righthand side of the banner.  Exhibit F at 1.  The logos in the banner use the same format, with an icon on the left and the name of the company on the right.  Underneath the banner is a similar text and picture duo, with text on the left and a picture of a woman on the right.  NextMed's states: "Personalized, Doctor-Backed Weight Loss Medicine."  Similarly, Sunrise's states: "Doctor-led & Personalized Weight Loss Program."  Underneath each side-by-side is a list of publications in which the business has appeared.

125.    Scrolling down on the landing page, the similarities continue.  The sites list the same three step process to use the company's service, with a combination of pictures and text for each step.  *See* Exhibit F at 2.  Both the NextMed website and the Sunrise website list the first step in the process as "Consultation" with a doctor.  The text on both sites refers to a review of medical history by a certified doctor.  The second step on the NextMed website is "Get Medication" with a graphic of a pill bottle.  The second step on the Sunrise website is "Prescription Medication"

with a picture of a pill bottle.  Both sites state that users can pick up medication at their local pharmacy or have medication shipped to their home.  The third step on both sites involves losing weight.  NextMed's third step is "Lose Weight" and Sunrise's third step is "Start Losing Weight."  Underneath step 3, both sites refer to "lab testing" and meetings with clinicians to check "progress."

126.    Both sites include a section about insurance, with identical text that reads "Insurance can cover most costs."  *See* Exhibit F at 3.  In both, the text appears on the left, and on the right are the logos of major insurance companies.  As shown in the picture accompanying paragraph 116, above, Sunrise appears to have copied the "logo_wrapper" code from NextMed's website to insert logos of the insurance companies on the Sunrise website.

127.    Next, there is a "questions" section at the bottom of both landing pages.  *See* Exhibit F at 4.  Both have a larger header containing the word "questions?" on the left, and then drop-down Q&As on the right.

128.    The very bottom of the landing page is formatted identically.  *See* Exhibit F at 5.  Both sites have a dark blue footer with white text that contains links for contact, privacy practices, and terms of service.

129.    Exhibit F also shows font and coloring similarities among the two sites.  Both sites use the same style of font.  Both sites also use a white, blue, and black color scheme.

130.    In addition to copying the layout, text, and coloring of the NextMed website, the Sunrise website also rips off the checkout flow used by NextMed's site.  NextMed allows users to purchase its services in as few as two clicks once they reach the website.  Exhibit G shows the checkout flows of both sites.  The Sunrise website copies this design, with a button to purchase "Now" for a special introductory price the first month.  *See* Exhibit G at 1.  If a user clicks that

button, the site points to a purchase page where the user inputs their payment information without having to provide any personal information beyond payment details. *See id.* at 2. This process is the result of extensive research and development by NextMed to maximize the likelihood of customer acquisition. Epstein shared this process with Tej in confidence while building the NextMed website.

131.    Sunrise also copied the intake design of the NextMed website. Images of the Sunrise website taken on November 25, 2022 show that Sunrise copied the intake questions that customers answer once they have provided their payment information. *See* Exhibit H. The first question asks the customer about what type of insurance they have. The second question asks if the customer is willing to increase their physical activity alongside medication, which a subscript that states insurance is more likely to reimburse customers that are willing to increase their physical activity. The last question asks if the customer has any further information the customer would like the doctor to know, with disclaimer that the customer should tell the doctor if they use any opiate medications, including naltrexone.

132.    Since NextMed filed its original complaint, Sunrise appears to have taken down its obviously copied "customer reviews" from https://www.findsunrise.com/. Exhibit I shows a comparison of the customer review sections as they appeared on November 25, 2022. Some of the Sunrise reviews appear to have been copied verbatim from NextMed's Trustpilot page, as shown on the first page of Exhibit I. As shown on the second page of Exhibit H, the member review sections of the NextMed and Sunrise websites were formatted in an identical manner. Both had pictures and videos of users of the service. Both had excerpts of reviews with stars and text, with the stars appearing above the text.

133.     In fact, it appears that Sunrise created a second website following the filing of the complaint in this case.  The new website is hosted at https://app.findsunrise.com/.   While Sunrise changed some of the features on the new website, it still uses the same layout and text as NextMed's website.  The new Sunrise website even plagiarizes the headline directly below the site banner from NextMed's website.  As shown in Exhibit J, both sites have a headline proclaiming, "The Most Comprehensive Weight Loss Program Available."

134.     A review of the Sunrise and NextMed websites makes obvious that Defendants copied the overall look and formatting of the NextMed website.  Defendants Sunrise, Tej, and Mehta willfully misappropriated the advertising, trade dress, and copyrights associated with the NextMed website.  In copying the NextMed website, Defendants duplicated and exploited the fruits of NextMed's extensive labor, research, and development.  This blatant copying of the NextMed website by Defendants Sunrise, Tej, and Mehta tramples on NextMed's intellectual property rights.

**CAUSES OF ACTION**

**COUNT I**

**VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1832 *et seq.*)**
**(AGAINST DEFENDANTS TEJ, MEHTA, AND SUNRISE)**

135.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

136.     The facts pled above constitute actual misappropriation of trade secrets by Defendants Tej, Mehta, and Sunrise in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*

137.     NextMed's trade secrets misappropriated by Defendants include NextMed's client list, revenue and products mix, churn data, customer emails and customer demographic

information, and detailed information related to NextMed's intake flow, pricing structure, insurance authorization process, vendor relations, and NextMed's customer acquisition costs and channel-by-channel marketing analysis (collectively, the "Protected Information"). These NextMed trade secrets are related to telehealth services used in interstate commerce.

138.    Defendants Tej, Mehta, and Sunrise have used and disclosed, and will continue to use and disclose, NextMed's Protected Information to solicit investment funds from venture capital firms and obtain new customers for Sunrise at the expense of NextMed.

139.    NextMed's Protected Information that was misappropriated by Defendants Tej, Mehta, and Sunrise has been subject to reasonable efforts by NextMed to maintain its secrecy and confidentiality. NextMed's Protected Information is not generally known or available to the public.

140.    NextMed's Protected Information is considered a trade secret under the DTSA because NextMed derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

141.    NextMed used efforts that were reasonable under the circumstances to maintain the confidentiality and protection of the Protected Information including, but not limited to, not disclosing the Protected Information to third parties, restricting access to such information, and storing files that include trade secrets, including the Protected Information, on secured devices.

142.    Defendants Tej, Mehta, and Sunrise knew at the time they used and/or disclosed the Protected Information that such information had been obtained and/or acquired through improper means: specifically, deceit, fraud, and deception. Defendants' knowledge that the

Protected Information was obtained through improper means is based on, among other things, the non-public nature of the information, the deceptive and untruthful means by which Tej solicited the information from NextMed, and the fact that Defendants Tej and Mehta created the entire Sunrise website in a matter of *weeks* when it took NextMed two years, several millions of dollars in funding, and significant man hours to develop what had been stolen.

143.    Defendants Tej, Mehta, and Sunrise continue to misappropriate NextMed's Protected Information by continuing to solicit NextMed's investors and customers using this information and by failing to return and/or destroy the Protected Information and shut down Sunrise.

144.    NextMed continues to face an immediate threat of irreparable harm, for which it lacks an adequate remedy at law, from Defendants' ongoing misappropriation of NextMed's trade secrets.

145.    Unless Defendants Tej, Mehta, and Sunrise are preliminarily and permanently enjoined from the foregoing conduct, NextMed will be irreparably harmed by:

      a.    Loss of confidentiality and trade secret status of information regarding NextMed's customers, investment deals, and other business-sensitive and marketing information;

      b.    Imminent loss of customers and relationships with investors;

      c.    Imminent loss of goodwill; and

D. Current and future economic loss, which is currently incalculable.

146.    Defendants' misconduct constitutes a willful and malicious misappropriation of NextMed's trade secrets.

147.     NextMed is entitled to a preliminary injunction and permanent injunctive relief permanently enjoining Defendants Tej, Mehta, and Sunrise from misappropriating, disclosing, or otherwise using NextMed's trade secrets.

148.     NextMed is further entitled to restitution, compensatory damages, exemplary damages, and attorneys' fees pursuant to 18 U.S.C. §§ 1832 and 1836.

## COUNT II

**COMMON LAW MISAPPROPRIATION OF TRADE SECRETS
(AGAINST DEFENDANTS TEJ, MEHTA, AND SUNRISE)**

149.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

150.     NextMed's Protected Information constitutes trade secrets.

151.     The Protected Information includes NextMed's client list, revenue and products mix, churn data, customer emails and customer demographic information, and detailed information related to NextMed's intake flow, pricing structure, insurance authorization process, vendor relations, and NextMed's customer acquisition costs and channel-by-channel marketing analysis.

152.     NextMed derives independent economic value from its Protected Information not being generally known, or readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

153.     NextMed has taken significant measures to maintain the confidentiality and secrecy of its Protected Information, including but not limited to restricting access to the Protected Information.

154.     As described herein, Defendants Tej, Mehta, and Sunrise improperly stole and used the Protected Information to, among other things, solicit NextMed's investors away from NextMed

for their own benefit, after obtaining, through deception, fraud, and deceit, the Protected Information that they knew was improperly obtained.

155.   By virtue of the alleged conduct, Defendants Tej, Mehta, and Sunrise misappropriated NextMed's trade secrets in violation of New York common law.

156.   As a direct and proximate result thereof, NextMed has been and will continue to be irreparably harmed unless Defendants Tej, Mehta, and Sunrise are enjoined from further misappropriation.

157.   Further, Defendants' misappropriation of NextMed's trade secrets has and will continue to damage NextMed as described herein, in an amount to be determined at trial.

<u>COUNT III</u>

**FRAUDULENT INDUCEMENT
(AGAINST DEFENDANT TEJ)**

158.   Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

159.   Defendant Tej represented to NextMed, through its CEO Epstein, that disclosure of the Protected Information was a necessary step in K5's due diligence process in order for NextMed to secure an investment from K5.

160.   Defendant Tej represented to NextMed, through its CEO Epstein, that Tej was an employee of K5 and was authorized to obtain the Protected Information on K5's behalf, for the sole purpose of assessing K5's potential investment into NextMed.

161.   As described above in detail, Defendant Tej's representations to NextMed were materially false and misleading because Tej was not taking NextMed's Protected Information for the purpose of assessing K5's potential investment into NextMed but, instead, to develop and launch his own competing medical weight loss company, Sunrise.

162.     NextMed would not have given access to the Protected Information to Defendant Tej had NextMed known that Tej was not using such information from NextMed to assess K5's potential investment into NextMed.

163.     Defendant Tej intended to deceive NextMed, through its CEO Epstein, to disclose the Protected Information under false pretenses and knew, had reason to know, and/or was reckless in not knowing that his representations to Epstein about his purpose in obtaining the Protected Information were false when Tej made them.

164.     NextMed relied, to its detriment, on Defendant Tej's misrepresentations and false statements by disclosing the Protected Information when Tej never had any intention of using such information for purposes of soliciting an investment from K5.

165.     NextMed's reliance on the misrepresentations and false statements of Defendant Tej was both reasonable and justifiable because NextMed had no reason to doubt the truthfulness of his representations.

166.     As a direct and proximate result of relying on Defendant Tej's misrepresentations and false statements, NextMed was damaged as discussed herein.

167.     NextMed is entitled to an award of damages in an amount to be proven at trial, but no less than $1,000,000, plus attorneys' fees and costs.

## COUNT IV

### FRAUDULENT CONCEALMENT
### (AGAINST DEFENDANT TEJ)

168.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

169.     Defendant Tej failed to disclose material information to NextMed.  Specifically, in inducing NextMed to share the Protected Information with him under the guise of using it for K5's

diligence efforts, Defendant Tej concealed his true intention to use the Protected Information to start a business in competition with NextMed and solicit investors and vendors away from NextMed.

170.    Upon information and belief, Defendant Tej purposefully omitted this material information in an effort to obtain the Protected Information from NextMed.

171.    As a party to the conversations and acts in which Defendant Tej acquired the Protected Information from NextMed, Tej had a duty to disclose complete and accurate information relating to his intent to build a competing business with NextMed.

172.    Defendant Tej knew he was purposely omitting material information regarding the steps he was taking to start a competing business with NextMed in his discussions with Epstein, and/or that a material misrepresentation was made, and did so with the intent to deceive NextMed.

173.    NextMed, through its CEO Epstein, relied to its detriment on the misrepresentations and omissions of Defendant Tej by disclosing the Protected Information to him when he had no intention of using it to solicit an investment by K5 in NextMed.

174.    NextMed's reliance on the misrepresentations and false statements of Defendant Tej was both reasonable and justifiable because NextMed had no reason to doubt the truthfulness of his representations.

175.    As a direct and proximate result of relying on the misrepresentations and false statements of Defendant Tej, NextMed was damaged as discussed herein.

176.    NextMed is therefore entitled to an award of damages in an amount to be proven at trial, but no less than $1,000,000, plus attorneys' fees and costs.

## COUNT V

### FRAUDULENT MISREPRESENTATION
### (AGAINST DEFENDANT TEJ)

177.    Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

178.    Defendant Tej represented to NextMed, through its CEO Epstein, that disclosure of the Protected Information was a necessary step in K5's due diligence process in order for NextMed to secure an investment from K5 and that Tej was an employee of K5 who was authorized to obtain the Protected Information on K5's behalf for the sole purpose of assessing K5's potential investment into NextMed.

179.    Defendant Tej's representations to NextMed were materially false and misleading because Tej was not taking NextMed's Protected Information for the purpose of assessing K5's potential investment into NextMed but, instead, to develop and launch his own competing medical weight loss company, Sunrise.

180.    NextMed would not have given access to the Protected Information to Defendant Tej had NextMed known that Tej was not using such information from NextMed to assess K5's potential investment into NextMed.

181.    Defendant Tej intended to deceive NextMed, through its CEO Epstein, to disclose the Protected Information and knew, had reason to know, and/or was reckless in not knowing that his representations to Epstein about his purpose in obtaining the Protected Information were false when Tej made them.

182.    NextMed relied, to its detriment, on Defendant Tej's misrepresentations and false statements by disclosing the Protected Information when Tej never had any intention of using such information for the purposes of soliciting an investment from K5.

183.    NextMed's reliance on the misrepresentations and false statements of Defendant Tej was both reasonable and justifiable because NextMed had no reason to doubt the truthfulness of his representations.

184.    As a direct and proximate result of relying on Defendant Tej's misrepresentations and false statements, NextMed was damaged as discussed herein.

185.    NextMed is entitled to an award of damages in an amount to be proven at trial, but no less than $1,000,000, plus attorneys' fees and costs.

**COUNT VI**

**AIDING AND ABETTING FRAUD**
**(AGAINST DEFENDANT MEHTA)**

186.    Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

187.    As described herein, Defendant Tej represented to NextMed, through its CEO Epstein, that disclosure of the Protected Information was a necessary step in K5's due diligence process in order for NextMed to secure an investment from K5 and that Tej was authorized to obtain the Protected Information on K5's behalf for the sole purpose of assessing K5's potential investment into NextMed.

188.    Defendant Tej's representations to NextMed were materially false and misleading because Tej was not taking NextMed's Protected Information for the purpose of assessing K5's potential investment into NextMed but, instead, to develop and launch a competing medical weight loss company—Sunrise—with Defendant Mehta.

189.    Defendant Mehta had knowledge of Tej's fraudulent misappropriation of the Protected Information from NextMed and substantially assisted therein by communicating directly

43

with Tej to obtain such information, working with Tej to obtain additional Protected Information from NextMed, and using NextMed's Protected Information to develop and launch Sunrise.

190.    NextMed is therefore entitled to damages in an amount to be determined at trial.

## COUNT VII

### COPYRIGHT INFRINGEMENT
### (AGAINST DEFENDANTS TEJ, MEHTA, AND SUNRISE)

191.    Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

192.    NextMed created the Copyright; as such, those works are authored by NextMed.

193.    All works created by any person or entity working for or on behalf of NextMed constitute works made for hire belonging to NextMed under the Copyright Act, 17 U.S.C. §§ 101 and 201(b).

194.    NextMed, as owner of all rights and interest in and to the Copyright, enjoys exclusive rights to use, reproduce, distribute, publicly display, publish, and prepare derivative works of the same under the Copyright Act, 17 U.S.C. § 106.

195.    Upon information and belief, Defendants Tej, Mehta, and Sunrise have access to the NextMed Copyright, and there are probative, substantial, and striking similarities between Defendants' works (including but not limited to the Sunrise website) and NextMed's Copyright.

196.    Defendants Tej, Mehta, and Sunrise, through their unauthorized actions, have reproduced and copied the Copyright, infringing upon NextMed's copyrights therein.

197.    Those elements of the Copyright copied by Defendants Tej, Mehta, and Sunrise constitute protected expression and are of such importance to the copied work that the appropriation is actionable.

198.    Any changes or modifications Defendants Tej, Mehta, and Sunrise have made to the Copyright are unlawful derivative works, as they constitute works that are based upon or incorporate the Copyright under 17 U.S.C. § 101.

199.    Defendants Tej, Mehta, and Sunrise have publicly distributed and displayed the Copyright, as described herein, in violation of NextMed's exclusive copyrights in those works and 17 U.S.C. § 106.

200.    Because Defendants Tej, Mehta, and Sunrise each knew, or should have known, that he or it was not the author or owner of the Copyright, and knew, or should have known, that NextMed owned the same, Defendants each are liable for direct copyright infringement because each had access to the Copyright, and there are probative, substantial, and striking similarities between the Sunrise website and NextMed's Copyright.

201.    NextMed has not granted permission, whether express, implied or otherwise, for any Defendant to reproduce distribute, display, publish, or prepare derivatives of the Copyright.

<u>**COUNT VIII**</u>

**INFRINGEMENT OF TRADE DRESS**
**UNDER THE LANHAM ACT (15 U.S.C. § 1125(a))**
**(AGAINST DEFENDANTS TEJ, MEHTA, AND SUNRISE)**

202.    Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

203.    The design and trade dress of the NextMed website includes the blue, white, and black color scheme and the font style.

204.    The design and trade dress of the NextMed website includes the layout of the landing page, including the banner, the side-by-side text and pictures under the banner, the reference to appearances in certain publications, the three-step process for signing up through the site, the user pictures and videos, the reviews, and the drop-down Q&As, as alleged above.

205.    NextMed incorporates the color scheme and fonts associated with its website in its advertising.

206.    As a result of NextMed's advertising, the trade dress of the NextMed website now has a secondary and distinctive trade dress meaning to potential purchasers of NextMed's products and services, in that potential purchasers have come to associate the color scheme, font, and website design with NextMed.

207.    Defendants Tej, Mehta, and Sunrise intentionally developed the Sunrise website to be confusingly similar to NextMed's trade dress such that it misleads customers to believe that the products and services sold on the Sunrise website are sponsored, endorsed, or sold by NextMed.

208.    NextMed and Sunrise Health operate in the same niche industry and sell the same service.

209.    The confusingly similar aspects of the two websites include, without limitation, the overall look of the Sunrise website, which is presented in a style and manner so as to be confusingly similar to the NextMed website.  This includes, without limitation, the color scheme, fonts, the layout of the website, and the photos and videos featured on the site.

210.    The design and trade dress of the NextMed website is arbitrary and nonfunctional. The colors, website design layout, graphics, font, and logos that form the trade dress used on the NextMed website are not essential to the use of the website, nor do the features affect the cost or quality of products sold by NextMed.

211.    The design and trade dress of the NextMed website has become identified in the market for weight loss telemedicine as originating with NextMed.

212.    NextMed has exclusively and continuously used the design of the NextMed website since 2020.

213.    NextMed has extensively advertised and promoted the NextMed website.

214.    Defendants' willful and complete duplication of the NextMed website from the style and positioning of each creative element, to the color combination, to the fonts, has resulted in the Sunrise website being an exact replica of the NextMed website.

215.    Upon information and belief, Defendants Tej, Mehta, and Sunrise purposefully selected the trade dress of the NextMed website for the design of the Sunrise website in bad faith to trade off the goodwill of the NextMed website's trade dress.

216.    NextMed never licensed or otherwise authorized Defendants Tej, Mehta, or Sunrise to use its trade dress.

217.    NextMed has been damaged by Defendants' misappropriation and unauthorized use of its trade dress.

## COUNT IX

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST DEFENDANT TEJ)

218.    Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

219.    NextMed had a business relationship with its investor K5.

220.    As described herein, Defendant Tej interfered with NextMed's relationship with K5 by encouraging Epstein to exit NextMed's deal with K5 and, upon information and belief, engaging in discussions with K5 that resulted in K5 cutting the amount it was willing to invest in NextMed from $30 million to $20 million.

221.    In doing so, Defendant Tej acted with the sole purpose of harming NextMed's business and benefiting Sunrise.

222.    Defendant Tej acted with malice and tried to harm NextMed's business with K5.

223.     As alleged herein, Defendant Tej's misconduct caused NextMed monetary damages to be calculated at trial and non-monetary damages in the form of loss of goodwill, among other things.

## COUNT X

**UNFAIR COMPETITION**
**(AGAINST DEFENDANTS TEJ, MEHTA, AND SUNRISE)**

224.     Plaintiff re-alleges and incorporates by reference the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

225.     NextMed invested considerable time and resources in developing the Protected Information into a valuable asset that provided a significant competitive advantage to NextMed.

226.     Defendants Tej, Mehta, and Sunrise have taken the Protected Information for themselves and have disclosed and/or used the Protected Information without NextMed's permission.

227.     Defendants Tej, Mehta, and Sunrise made unauthorized use of the Protected Information by stealing it for their own benefit to start Sunrise and obtain investment funds from venture capital firms as well as new customers and vendor relationships to the detriment of NextMed.

228.     As a consequence, NextMed has been and continues to be harmed.

229.     Defendants' conduct constitutes common law unfair competition and was carried out willfully, fraudulently, maliciously, with the intent to deceive NextMed, and with wanton disregard of NextMed's rights.

230.     NextMed is therefore entitled to compensatory and punitive damages in an amount to be proven at trial.

**COUNT XI**

**USURPING CORPORATE OPPORTUNITY**
**(AGAINST DEFENDANT TEJ)**

231.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

232.     As described herein, Tej exploited NextMed's Protected Information and diverted investment opportunities from NextMed for the benefit of himself and Sunrise while serving as an advisor to NextMed.

233.     As described herein, NextMed has been damaged as a result of Tej's exploitation and diversion of NextMed's business opportunities.

234.     By virtue of the forgoing conduct, Defendant Tej has violated New York's corporate opportunity doctrine.

235.     NextMed is therefore entitled to damages in an amount to be determined at trial.

**COUNT XII**

**CIVIL CONSPIRACY**
**(AGAINST DEFENDANTS TEJ AND MEHTA)**

236.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

237.     Defendants Tejsasvi and Mehta conspired with one another to achieve a common, unlawful purpose—*i.e.*, fraudulently inducing NextMed, through its CEO Epstein, to divulge the Protected Information to Tej and Mehta under false pretenses when, in reality, Tej and Mehta were using the Protected Information to develop their own competing business, Sunrise.

238.     As alleged above, Defendants Tej and Mehta committed an overt act in furtherance of the common scheme.  Defendant Tej engaged in substantial discussions with NextMed, through its CEO Epstein, to fraudulently misappropriate the Protected Information.  Defendant Mehta then

obtained NextMed's trade secrets from Tej and used them to develop Sunrise in direct competition with NextMed.

239.     Defendants Tej and Mehta both committed or otherwise participated in the above-alleged torts and statutory violations in furtherance of their scheme to misappropriate the Protected Information and enrich themselves in the process.

240.     Accordingly, Defendants Tej and Mehta are jointly and severally liable for civil conspiracy, including any damages sustained by Plaintiff in connection with Defendants' commission of tortious or other unlawful acts.

## COUNT XIII

### CONVERSION
### (AGAINST DEFENDANT TEJ)

241.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

242.     NextMed has a possessory right or interest in its trade secrets, *i.e.*, the Protected Information.

243.     As alleged in detail above, Defendant Tej, intentionally and without authority, misappropriated the Protected Information from NextMed, through its CEO Epstein.  To that end, Tej falsely represented to Epstein that disclosure of the Protected Information was necessary for K5's due diligence process in order for NextMed to secure an investment from K5 when in fact he was unlawfully using it for his own purposes to create a company that would directly compete with NextMed.

244.     NextMed is entitled to damages in an amount to be determined at trial.

## COUNT IX

### UNJUST ENRICHMENT
### (AGAINST DEFENDANTS TEJ, MEHTA, AND SUNRISE)

245.     Plaintiff re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

246.     As alleged above, Defendants Tej, Mehta, and Sunrise have used and disclosed, and will continue to use and disclose, the Protected Information they stole from NextMed to raise funding from venture capital firms (including $30 million from Thrive Capital and Green Oaks), onboard new customers, and obtain substantial revenue for Sunrise at the expense of NextMed.

247.     Both equity and good conscience militate against permitting Defendants to keep the venture capital funds, customers, and revenue they have unlawfully obtained using the trade secrets they misappropriated from NextMed.

248.     NextMed is therefore entitled to damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against all Defendants as follows:

a)     Granting preliminary and permanent injunctive relief pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, and New York common law, enjoining Defendants, and anyone acting in concert with Defendants, from using, disclosing, selling, copying, duplicating, or otherwise employing Plaintiff's trade secrets, including through using or employing any documents, files, platforms, websites, systems, or other information that is derived from Plaintiff's trade secrets;

b)     Granting preliminary and permanent injunctive relief enjoining Defendants from providing their website, currently at https://www.findsunrise.com/ and https://app.findsunrise.com/ or any variations thereof, to the public;

c)      Issuing an order and judgment providing that Defendants' misappropriation of trade secrets was willful and malicious, and awarding exemplary damages and attorneys' fees as the Court finds proper;

d)      Granting preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502 against Defendants Tej, Mehta, and Sunrise barring them from directly or indirectly infringing on Plaintiff's Copyright or continuing to use, market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop or manufacture any works derived or copied from Plaintiff's Copyright or to participate or assist in any such activity;

e)      Issuing an order and judgment providing that Plaintiff is the rightful owner of the Copyright;

f)      Issuing an order and judgment providing that by copying, reproducing, displaying, using, publishing, distributing and preparing derivative works of the Copyright and Plaintiff's trade dress, Defendants have infringed on Plaintiff's exclusive rights thereto;

g)      Issuing an order and judgment providing that Defendants are jointly and severally liable to Plaintiff for Plaintiff's actual damages and any additional profits of the Defendants or statutory damages, in accordance with 17 U.S.C. § 504 and for Plaintiff's costs and attorney fees pursuant to 17 U.S.C. § 505.

h)      Issuing an order and judgment providing that Defendants are jointly and severally liable to Plaintiff for its reasonable attorneys' fees and such other compensatory damages as this Court may determine to be fair and appropriate pursuant to, 15 U.S.C. § 1117(a);

i)      Awarding Plaintiff direct, compensatory, and consequential damages in an amount to be determined at trial, to compensate Plaintiff for the losses it has suffered by Defendants' misconduct, together with exemplary and punitive damages where applicable;

j)      Awarding Plaintiff all reasonable attorneys' fees and costs; and

k)      Awarding Plaintiff such other and further relief as the Court deems just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: December 19, 2022
       New York, New York

By: */s/ Randy M. Mastro*
Randy M. Mastro
Brian E. Ashin
Jessica Benvenisty
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 827-4019
rmastro@kslaw.com
bashin@kslaw.com
jbenvenisty@kslaw.com

Andrew D. Bochner
Serge Krimnus
BOCHNER IP, PLLC
295 Madison Ave, 12th Fl.
New York, NY 10017
(646) 971-0685
andrew@bochnerip.com
serge@bochnerip.com

*Counsel for Plaintiff*

## VERIFICATION

ROBERT EPSTEIN being duly sworn, deposes and says:

I, Robert Epstein, am the Chief Executive Officer of the Plaintiff in this action and as such I am familiar with the facts alleged herein. I have read the foregoing Verified Amended Complaint and know the contents thereof. The same are true to my knowledge, except as to those matters alleged upon information and belief, and as to those matters I believe them to be true.

By: _____

Robert Epstein

State of New York
County of New York

Sworn to me this
_19th_ day of December, 2022

Notary Public

JANINE M KOGEL
Notary Public - State of New York
NO. 01K06150107
Qualified in Westchester County
My Commission Expires 07/31/2026

## EXHIBIT INDEX:  AMENDED COMPLAINT

| EXHIBIT | DESCRIPTION |
| --- | --- |
| A | Advisor Agreement (October 2020) |
| B | Common Stock Purchase Agreement (December 2020) |
| C | NextMed and Sunrise Google Sponsored Advertisements |
| D | NextMed and Sunrise Video Advertisement Screenshots and Scripts |
| E | NextMed Website Copyright Listing in Public Catalog |
| F | NextMed and Sunrise Website Landing Pages |
| G | NextMed and Sunrise Website Checkout Flows |
| H | NextMed and Sunrise Customer Intake Forms |
| I | NextMed and Sunrise Customer Reviews |
| J | NextMed and Sunrise Website Headlines |